12 P.3d 371

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Tan T. HOANG, Defendant–Appellant.**

No. 21869.

Intermediate Court of Appeals of Hawai'i.

Oct. 17, 2000.

Certiorari Denied Nov. 13, 2000.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

By judgment entered on July 24, 1998 in the district court of the first circuit, Defendant–Appellant Tan T. Hoang (Hoang) was convicted of assault in the third degree following a bench trial. He appealed. On remand from the Hawai'i Supreme Court, *State v. Hoang*, 93 Hawai'i 333, 337, 3 P.3D 499, 503 (2000), we address Hoang's remaining points of error. These are, (1) that the trial court committed plain error in failing to ob-

tain a knowing and voluntary waiver of Hoang's right to testify; (2) that the court erred in convicting Hoang of assault in the third degree, because there was insufficient evidence to prove beyond a reasonable doubt that Hoang caused bodily injury to the complaining witness; and (3) that the court erred in failing to afford Hoang his right to allocution before imposing sentence upon him.

We agree with Hoang that the court committed plain error in failing to obtain, directly from him, a waiver of his right to testify. Concluding that this error was not harmless beyond a reasonable doubt, and disagreeing with Hoang that there was insufficient evidence to convict him, we vacate the July 24, 1998 judgment and remand for a new trial. In order to provide guidance to the court on remand, we also address Hoang's last point of error.

## I. BACKGROUND.

Before the trial started, the court dealt with two preliminary matters. First, an understanding was reached regarding Hoang's comprehension of the proceedings:

> [DEFENSE COUNSEL]: Good afternoon, your Honor.
>
> The defendant, Tan Hoang, is present together with his attorney ... and with a Vietnamese translator[.]
>
> . . . .
>
> Your Honor, with respect to Mr. Hoang's English-speaking ability, it's my understanding that he can understand everyday English, but not big words, or when words are talk—spoken rapidly. And so I have asked the—Mr. Hoang to indicate to us when he's having any difficult [sic] and with the Court's permission then have the Vietnamese translator step in and assists [sic].
>
> THE COURT: Well, tell me this. Are you going to be—so there's going to be no simultaneous translation?
>
> [DEFENSE COUNSEL]: That's not my intention, your Honor. I was thinking that at that time that Mr. Hoang testify [sic] if that come [sic] to past [sic]—
>
> THE COURT: Yes. Okay.

> [DEFENSE COUNSEL]: Well, at that time, I would see if he was having any difficulty understanding the questions and giving answers.
>
> THE COURT: All right. What about his understanding of the State's witnesses as they are testifying? Will [the interpreter] be giving him simultaneous translation at that point?
>
> [DEFENSE COUNSEL]: I was going to see if he is—was going [sic] tell us if he wasn't—be able to follow the testimony at that time and then asks [sic] her to provide.
>
> THE COURT: Okay. Mr. Hoang, then you understand what your attorney has just said so that if for any reason you could do not understand what a witness is saying, [the interpreter] will translate for you. Do you understand?
>
> [HOANG]: Yes.
>
> THE COURT: Okay. So you will have to let [the translator] know if you do not understand. You understand that?
>
> [HOANG]: Yes.
>
> THE COURT: Otherwise, I'm going to order that the translation be simultaneous.
>
> [DEFENSE COUNSEL]: I understand, your Honor.
>
> . . . .
>
> But I do believe Mr. Hoang can understand—
>
> . . . .
>
> —everyday English.

The court then engaged Hoang in the colloquy recommended by the Hawai'i Supreme Court in *Tachibana v. State*, 79 Hawai'i 226, 237 n. 9, 900 P.2d 1293, 1304 n. 9 (1995):

> THE COURT: Okay. Now, Mr. Hoang, as this trial proceed [sic], there is something you need to know. You have a right in this trial to testify if you want to. Do you understand that?
>
> [HOANG]: Yes.
>
> THE COURT: You also have a right not to testify if you do not want to. Do you understand that?
>
> [HOANG]: Yes.
>
> THE COURT: If you come and testify at your trial, the prosecutor can asks [sic]

you any questions about anything you said. Do you understand that?

[HOANG]: Yes.

THE COURT: However, if you choose not to testify, in other words, if you don't want to come here and testify, you do not have to. Do you understand that?

[HOANG]: Yes.

THE COURT: Do you understand that if you do not testify, that cannot be used against you to establish the fact that you are guilty. Do you understand that?

[HOANG]: Yes.

THE COURT: If anything I'm saying is not understood by you, you can asks [sic] your—the translator to explain it to you. Do you understand that?

[HOANG]: Yes.

THE COURT: Okay. Proceed, please.

The State called the complaining witness, Thomas Charles Cox (Cox), as its first witness.

Cox remembered that on March 15, 1998, he rode his bicycle to the French Wrench Shell gas station on Ward Avenue to buy a pack of cigarettes. He walked into the convenience store area of the station, but no one was in attendance. He had noticed as he rode up that Hoang was outside the store in a "Honda car" with two other males. Cox maintained that he saw them drinking what looked like beer out of a green bottle.

Hoang followed Cox into the store. Hoang was wearing a red shirt with a Shell emblem. After Cox bought his cigarettes, he asked Hoang for a book of matches. Hoang replied, "No more. No more." Cox persisted, "You don't have matches for your—your—your customers who buy cigarettes?" Hoang replied, "No more. Fuck you." In response to this apparent breakdown in customer service, Cox remonstrated, "Is that any way to talk to your customers?"

Hoang then repeated the epithet, reached down behind the store counter and came out with a pipe. Hoang advanced on Cox from behind the counter in what Cox described as a threatening manner, repeating the epithet over and over again. Frightened, Cox turned to leave the station, but was stopped just outside the doorway by the two males who had been in the car with Hoang. They stood side by side in front of Cox, menacing him with their fists up. As Cox turned for "a split second" to check on Hoang, one of the males, whom Cox described as a young Vietnamese, hit him above the right eye with a fist bolstered by "a small wooden sort of a block" in its grip.

Before he could react, Cox felt Hoang strike him in the back of his neck and lower head with what he believes was the pipe. Driven to his knees or nearly so, Cox felt like he was going to black out. Cox regained his feet, however, and ran toward Ward Avenue in an effort to get away, with the two males chasing and Hoang in pursuit with the pipe. Cox slipped and fell before he could get to the sidewalk on Ward Avenue. On his knees facing the ground, Cox felt his pursuers strike him several more times on his back.

Cox finally managed to escape and called 911 on a pay phone. An ambulance took him to Straub Hospital, where they stitched up a cut above his right eye. Cox claimed that the blood from that cut had "covered" his shirt. Cox complained at trial that he continues to suffer daily headaches, blackouts and vision problems as a result of the incident.

On cross-examination, Cox admitted that the police report of his statement following the incident described the initial disagreement as a "verbal argument." He also admitted, "I may have told [Hoang] 'F you' back." Cox conceded that he may have raised his voice at Hoang, but denied yelling at him. He categorically denied telling Hoang, "You wait here. I'm going to get a gun." Cox confirmed that he did not know who was hitting him after he slipped and fell near the sidewalk on Ward Avenue. Cox described the two males with Hoang as "Asian." In particular, Cox described the male who hit him over the right eye as a tall, "Asian man or Vietnamese man" with light skin and bleached blond hair. Cox estimated Hoang to be "five-three, hundred and seventy pounds." Cox gave his height as "six-two" and his weight as "two hundred and thirty-five pounds."

The State then presented the testimony of Kathleen McGraw (McGraw).

McGraw related that she was using the pay phone at the gas station at about 9:00 p.m. on the night of the incident. She saw "a [Caucasian] man little bit poorly dressed" approach a car located between the pay phone and the station office. She could not hear what was said because she was on the phone, but she did hear "something about matches." Two males in the car, whom she described as "an Asian male and [a] Caucasian male" with blond hair, seemed to be very angry at the poorly dressed man.

McGraw testified that "a lot of anger and, you know, arguing" ensued. The blond Caucasian male, the more vehement of the two in the car, jumped out from the passenger side of the car looking "very, very upset." The object of his anger started to walk away, but the blond Caucasian male commenced "a lot of ... pushing and all that." The Asian male seemed reluctant at first, but then he, too, went after the poorly dressed man. At that point Hoang, wearing "a red shirt and dark color pants," emerged from the station "with something in his hands." He, along with the Asian male and the blond Caucasian male, pursued the man to the edge of the street, where Hoang hit their quarry in the back. The other two men "were pushing him around also."

Frightened by the spectacle, McGraw left and went back to her residence nearby. She later returned, however, and spoke with the police investigating the incident. She showed the police where Hoang had come from when he was carrying the pipe. A police officer went there, inside the station office, and retrieved a pipe. McGraw identified the pipe as the object Hoang had in his hand when he came out of the station.

On cross-examination, McGraw confirmed that she is nearsighted, but that she was not wearing either her prescription glasses or her contact lenses that night. She insisted, however, that, "It's a little blurry, but I can make out what's happening. I'm not blind." When asked whether she was sure she saw Hoang hit Cox, McGraw detailed what she saw at the edge of the street: "Well, I saw him—I saw it raised, and I saw the guy hunch over so, I mean, that was my conclusion." When pressed by defense counsel about how certain she was of her conclusion, McGraw conceded that, "I wouldn't stake my life on it. No."

On redirect examination, McGraw again detailed the sequence of events she saw unfold at the edge of the street: the raised pipe, its rapid declension and Cox's reaction as if struck in the back.

The State closed its presentation of evidence with the testimony of two police officers who investigated the incident.

Officer Kelly Pahio (Officer Pahio) was called to the scene at about 9:30 p.m. When he arrived he saw Cox, who was "really excited," bleeding from his eyebrow area down his face and onto his shirt. Based upon what Cox told him, Officer Pahio arrested Hoang. When Officer Pahio first approached Hoang and informed him he was a suspect, Hoang protested that "the guy attacked him first, and he was just defending himself." Officer Pahio also spoke with McGraw, whereupon he recovered the pipe from inside the station office.

On cross-examination, Officer Pahio confirmed that Hoang was calm and cooperative throughout their encounter, that he complied with all of Officer Pahio's requests and that he was concerned—as the only employee at the gas station that night—about securing the station before his arrest. Officer Pahio also remembered that Hoang did not say he hit Cox with the pipe.

Officer Thomas Smith (Officer Smith) assisted Officer Pahio in arresting Hoang. Officer Smith recalled that during the arrest, Hoang told him that "he was only holding the pipe" and that "we only use our hands."

On cross-examination, Officer Smith also confirmed that Hoang did not say he hit Cox with the pipe.

At this point, the State rested. After having his motion for judgment of acquittal denied by the court, Hoang called in his defense one witness, Russell Harrison Uchiro Tasato (Tasato).

At 9:00 p.m. on March 15, 1998, Tasato had just finished work at the New City Nissan car dealership on Ala Moana Boulevard. He drove to the French Wrench Shell gas sta-

tion on Ward Avenue to get a pack of ciga-
rettes. As he was walking to the conve-
nience store at the station, he heard yelling
coming from inside the store. Cox and
Hoang were arguing. It looked to Tasato
like the "big guy" was going to "pounce on
top of [Hoang]". The yelling had something
to do with matches.

When Tasato was about fifteen feet from
the store, he saw Cox and Hoang come to the
doorway arguing, then swearing at each oth-
er. Tasato also noticed "two [Asian] guys in
[a] Honda Accord" parked in the gas lane
closest to the store. When Cox and Hoang
came out of the door, they started yelling
back and forth at each other. Immediately
the two in the Honda jumped out and made a
beeline for the disputants.

The male that was in the driver's seat,
whom Tasato described as an "albino Asian
guy," lunged forward and punched Cox
somewhere on the forehead—"above his left
right eye." Cox "yelled something" and
touched his head. Upon discovering blood
on his hand, Cox began to chase the two
Asian males. As the chase commenced,
Hoang ran back into the store and grabbed a
pipe. Hoang then ran after the three, swing-
ing his pipe. Tasato added, however, that
Hoang "never hit [Cox] or anything."

Somehow the party of four got to the edge
of the station's property, where Hoang start-
ed swinging the pipe at Cox and Cox took to
dodging it. Under questioning by defense
counsel, Tasato reiterated that Hoang did not
at any time during the incident strike Cox,
either with the pipe, with his fist or with his
hands. Tasato did note, however, that there
was one point at which his view of the action
was blocked: "At one point right before the
guy, the Haole guy took off down the street,
there was a pump. Then there was a pump
kind of in—blocking my view. And I—it's—
just seem [sic] him from one end all three of
them running around the car to that pump,
and all of a sudden I just seen the Haole guy
just take off."

Later, when Hoang returned to the store,
Tasato got his pack of cigarettes and left.

It was four or five days later that Tasato
made a statement to the police about the

incident. The day after the incident, Hoang
and his employer went to see Tasato at his
workplace and asked him to make a state-
ment to the police. Due to a job change and
general inertia, it was several more days
before Tasato called the police to arrange an
interview.

On cross-examination, Tasato acknowl-
edged that New City Nissan has a business
relationship with the French Wrench Shell
gas station. New City Nissan fills its cars
with gasoline at the station. Tasato also
admitted that Hoang recognized him during
the incident. Tasato testified that, "I've seen
them a bunch of times."

On redirect examination, Tasato denied
that he is Hoang's friend: "Well, not—I
know—I don't know him personally. I just
know him by sight, you know, like from day-
to-day if we see—I mean, I fill up gas. As I
sell cars, I fill up gas there, and I just see
them."

After Tasato's testimony, Hoang rested his
case. The State immediately launched into
its closing argument. In the middle of the
State's argument, however, the court inter-
rupted:

THE COURT: Mr. [Prosecutor], I need
to stop you—

. . . .

—at this time before you go any further.

And in an abundance of caution, I be-
lieve I did indicate earlier, if I didn't, I'll
do it now to the defendant that he had an
absolute right to testify in this case.
The—I want the defendant before I hear
anything further from Mr. [Prosecutor] to
know that he does have an absolute right
to testify.

It's—sir, it's your decision to make
whether or not you want to testify in your
own behalf and you can consult with your
attorney before making that decision, but
you do have the right to testify if you want
to. If you do testify, the prosecutor could
asks [sic] you questions about anything
you say. If you do not want to testify, that
cannot be used against you in any way,
manner, shape, or form to show that you
are guilty. Do you understand that?

[DEFENSE COUNSEL]: The judge is asking you do you understand that you have the right to testify and aright [sic] not to testify. And if you choose not to testify, that cannot be used against you. Do you understand that?

[HOANG]: Yes.

THE COURT: Sir, do you understand that?

[DEFENSE COUNSEL]: That's right, your Honor. He has elected not to testify.

THE COURT: Okay. Very well. You may continue, Mr. [Prosecutor].

After closing arguments, the court found Hoang guilty as charged. The court started sentencing proceedings immediately after rendering its verdict, but then continued the proceedings pending a presentence report:

THE COURT: Does your client wish to address the Court?

[DEFENSE COUNSEL]: Would you like to talk to the judge before the judge sentences you? You have a right to talk to the judge with respect to any sentence, and you have that right before the judge imposes a sentence. Is there anything that you would like the judge to know about yourself before he makes his sentence?

THE COURT: Mr. [Defense Counsel], I think that given the nature of the case, I think a presentence report evaluation may be in order here. And then the defendant would have an opportunity to make any statements he wanted to at that particular time. And then maybe in a situation where he feels freer to do so unless he wants to waive that.

[DEFENSE COUNSEL]: Yes, your Honor. [Hoang] would like to avail himself of that opportunity.

THE COURT: Very well. Presentence report evaluation will be ordered by the Court. For that purpose, [Hoang] is referred to the court counselor for the report.

Okay. Sentencing date will be set. Thank you.

After the presentence report was completed, the court continued with the sentencing hearing. Hoang's attorney made arguments con-

cerning the appropriate sentence. The court then solicited allocution:

THE COURT: Thank you. Does your client wish to address the court?

[DEFENSE COUNSEL]: Your Honor, my client is—we talked about that and he is very nervous right now and anxious and he asked me to speak on his behalf and so the things that I've been telling your Honor are the things that he would want me to convey to you.

THE COURT: Very well, thank you.

The court sentenced Hoang to one year of probation upon terms and conditions, including a forty-five day stay in jail, completion of an anger management program and payment of $209 in restitution. Mittimus was stayed pending appeal.

## II. DISCUSSION.

### A. Hoang's Right To Testify Was Violated.

Hoang argues that the court committed plain error in failing to obtain a waiver of his constitutional right to testify directly from him: "The court . . . informed Hoang of his right to testify but Hoang never personally indicated that he waived the right to testify. The defense counsel's remark that '[h]e has elected not to testify' did not constitute a voluntary and knowing waiver by Hoang of his constitutional right to testify. Therefore, under *Tachibana*, the trial court committed plain error."

In *Tachibana, supra*, the Hawai'i Supreme Court held that "in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." *Tachibana*, 79 Hawai'i at 236, 900 P.2d at 1303 (footnotes omitted).

■ One of the primary purposes of the so-called "*Tachibana* colloquy" is to ensure that the defendant is "aware of his right to testify and that he knowingly and voluntarily waived that right." *Id.* at 237, 900 P.2d at 1304.

■ In this case, the court did make Hoang aware of his right to testify. The court personally and directly engaged Hoang in the recommended pretrial colloquy, *id.* at 237 n. 9, 900 P.2d at 1304 n. 9, as well as the colloquy required at the close of trial.[1] *Id.* at 237, 900 P.2d at 1304. In both instances, Hoang personally affirmed his understanding of his right to testify. Hence, if he had indeed waived his right to testify, we might well agree with the State, and deem it a knowing waiver made by a defendant fully aware of his right to testify.

However, in this case the interposition of defense counsel preempted a waiver directly from Hoang. The court apparently considered the waiver by defense counsel sufficient to satisfy the *Tachibana* waiver requirement:

> [DEFENSE COUNSEL]: The judge is asking you do you understand that you have the right to testify and aright [sic] not to testify. And that if you choose not to testify, that cannot be used against you. Do you understand that?
>
> [HOANG]: Yes.
>
> THE COURT: Sir, do you understand that?
>
> [DEFENSE COUNSEL]: That's right, your Honor. He has elected not to testify.
>
> THE COURT: Okay. Very well. You may continue, Mr. [Prosecutor].

■ *Tachibana* is not satisfied, however, by a waiver by proxy. And we do not niggle when we insist that the court obtain the defendant's waiver directly from the defendant. For another of the primary purposes of the *Tachibana* colloquy is to ensure that the waiver is indeed the defendant's and not that of the defendant's attorney. The constitutional right to testify is personal to the defendant, to be relinquished only by the defendant, and may not be waived by counsel as a matter of trial strategy. *Id.* at 232, 900 P.2d at 1299.

Our insistence upon a direct waiver not only protects the defendant's rights, but also maintains the integrity of the criminal justice system: "[I]f the trial court does not establish on the record that the defendant has waived his or her right to testify, it is extremely difficult to determine at a post-conviction relief hearing whether such a waiver occurred." *Id.* at 234, 900 P.2d at 1301 (citations and internal quotation marks and brackets omitted).

In *State v. Staley,* 91 Hawai'i 275, 982 P.2d 904 (1999), a case on all fours with this one, the trial court's elicitation of a waiver of the right solely from the defendant's attorney and not directly from the defendant constituted plain error which infringed upon the defendant's constitutional right to testify. *Id.* at 286, 982 P.2d at 915.

In *Staley,* the trial court personally engaged Staley in a pretrial colloquy in which he was informed of his right to testify and in which he personally affirmed his understanding of that right. *Id.* at 279–80, 982 P.2d at 908–9. At the close of evidence, however, the trial court accepted a waiver of Staley's right to testify from Staley's counsel and not directly from Staley. *Id.* at 280, 982 P.2d at 909.

The supreme court noted that "[w]hile the circuit court did engage in a colloquy with [Staley] regarding [Staley's] understanding of his right to testify, the circuit court failed to elicit an on-the-record waiver of [Staley's] right. The circuit court simply asked [Staley's] *attorney* whether [Staley] was 'going [to] testify.'" *Id.* at 286, 982 P.2d at 915 (italics in the original). The supreme court went on to hold that this circumstance constituted plain error:

> In the present matter, the circuit court did not elicit from [Staley] an on-the-record waiver of his right to testify. The record affords no means by which this

---

1. The court conducted the mandatory colloquy in the middle of the State's closing argument, not when Hoang was on the verge of resting his case as required by *Tachibana v. State,* 79 Hawai'i 226, 237, 900 P.2d 1293, 1304 (1995). The difference in timing was not, however, *ipso facto* reversible error. *Id.* ("If the trial court is unable to conduct the colloquy at that time; however, such failure will not necessarily constitute reversible error. If a colloquy is thereafter conducted and the defendant's waiver of his or her right to testify appears on the record, such waiver will be deemed valid unless the defendant can prove otherwise by a preponderance of the evidence.") (Citation omitted.)

court can discern whether [Staley] actually waived his right to testify or whether the decision was made entirely by his attorney. Based on the rule established in *Tachibana*, we hold that the circuit court's failure to establish on the record that [Staley's] decision not to testify was made knowingly and voluntarily constituted plain error.

*Id.* at 287, 982 P.2d at 916. *See also Tachibana*, 79 Hawai'i at 237–38, 900 P.2d at 1304–05 ("If our holding in this case were to apply retrospectively, we would be compelled to affirm the circuit court's conclusion that Tachibana's right to testify was violated based solely on the lack of such a colloquy.").

■ We therefore agree with Hoang and conclude that the court erred in failing to obtain a waiver of his right to testify directly from him. That established, the query remaining is whether the error was harmless beyond a reasonable doubt. If not, Hoang's conviction and sentence must be vacated. *Id.* at 240, 900 P.2d at 1307 ("Once a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt." (Citations omitted)).

■ In other words, "the question is 'whether there is a reasonable possibility that error may have contributed to conviction.' 'If there is ... a reasonable possibility ..., then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.'" *State v. Akahi*, 92 Hawai'i 148, 150–51, 988 P.2d 667, 669–70 (App.1999) (citations omitted).

In general, it is inherently difficult, if not impossible, to divine what effect a violation of the defendant's constitutional right to testify had on the outcome of any particular case. *See, e.g., State v. Silva*, 78 Hawai'i 115, 126, 890 P.2d 702, 713 (App.1995) ("The record does not indicate what Defendant would have testified to had he been allowed to testify."). The record in this case offers no clue to what Hoang would have said, under oath, on the witness stand.

We have previously held that where the decisive issue in a case is credibility, but at trial an eyewitness extensively contradicts the State's witnesses and supports the defendant's defenses, a reasonable possibility still remains that a violation of the defendant's right to testify contributed to conviction. *Akahi*, 92 Hawai'i at 159–60, 988 P.2d at 678–79. As we held in *Akahi*, a case involving a *Tachibana* violation,

[i]n this case, the decisive issue was credibility. As noted by counsel for [co-defendant] Grace [Akahi] in closing argument, the jury had to decide between "the police version of what occurred up at the land ... versus Grace Akahi's version of what occurred at the land[.]" We conclude that it cannot be said beyond a reasonable doubt that, if [defendant James Kimo] Akahi's and/or [co-defendant] Kaahanui's voices had been added to Grace's version of what occurred at the land, the jury's decision would not have been different.

*Id.* at 160, 988 P.2d at 679.

■ In this case, Cox and McGraw both testified for the State that Hoang hit Cox in the back with a pipe, albeit at differing times. Both Cox and McGraw testified to the effect that Hoang was an aggressor without justification. On the other hand, Tasato testified for the defense that Hoang did not strike Cox with anything at any time. In addition, Tasato gave testimony tending to show that it was Cox who first assumed an aggressive stance in the incident, supporting Hoang's overall defense.

The decisive issue in this case was, therefore, credibility. Tasato extensively contradicted the State's version of the incident and in doing so supported Hoang's defense. Following *Akahi*, we can nevertheless conclude that it cannot be said beyond a reasonable doubt that if Hoang's testimony had been added to Tasato's version of the incident, the verdict would not have been different.

From our independent review of the record, and given the conflict between the testimony of the State's witnesses and the testimony of Hoang's witness, and indeed the inconsistencies within the State's evidence itself, we cannot but conclude that there is a reasonable possibility that Hoang's testimony might have tipped the scales. By the same

token, we cannot conclude that the court's *Tachibana* error was harmless beyond a reasonable doubt. Hence Hoang's conviction and sentence must be vacated. *See Tachibana*, 79 Hawai'i at 240, 900 P.2d at 1307.

### B. The Evidence Was Sufficient To Convict Hoang Of Assault In The Third Degree.

■ Given the foregoing disposition of this case, we need address only one other issue Hoang presents in this appeal. "[C]hallenges to the sufficiency of the evidence must always be decided on appeal." *State v. Malufau*, 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995).

Hawai'i Revised Statutes (HRS) § 707–712 (1993) provides that "[a] person commits the offense of assault in the third degree if the person ... [i]ntentionally, knowingly or recklessly causes bodily injury to another person[.]" HRS § 707–700 (1993) provides, in pertinent part, that " '[b]odily injury' means physical pain, illness, or any impairment of physical condition."

Hoang argues that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he caused bodily injury to Cox. Hoang concedes on appeal that "[i]t is established that [Hoang] used the pipe to swing at Cox." Hoang contends, however, that McGraw did not actually see the pipe strike Cox. In this connection, Hoang also points to Tasato's insistence that Hoang did not strike Cox with anything at any time. Hoang enriches his argument with the undisputed evidence that the other Asian male punched Cox above his eye. He also mentions the disparity in size in favor of Cox and Tasato's testimony that it was Cox who first signaled aggression.

■ But Hoang misapprehends the applicable standard of review:

On appeal, the test for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact. *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992); *State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). " 'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.' " *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651 (quoting *Tamura*, 63 Haw. at 637, 633 P.2d at 1117). " 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *See id.* at 577, 827 P.2d at 651 (quoting *State v. Naeole*, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)).

*State v. Matias*, 74 Haw. 197, 207, 840 P.2d 374, 379 (1992).

■ Furthermore, "it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence[.]" *Tachibana*, 79 Hawai'i at 239, 900 P.2d at 1306 (citation and internal quotation marks omitted). The trial court as the fact-finder has the duty and the exclusive province to weigh and decide the credibility of the witnesses. *State v. Balberdi*, 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999) ("It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part. Further, an appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge." (Internal quotation marks, brackets and citations omitted)).

■ The trial court "may draw all reasonable and legitimate inferences and deductions from the evidence adduced from admitted or known facts, and findings of the trial court will not be disturbed unless clearly erroneous." *Lono v. State*, 63 Haw. 470, 473–74, 629 P.2d 630, 633 (1981) (citation omitted). Moreover, "guilt in a criminal case may be prove[n] beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence." *State v. Chow*, 77 Hawai'i 241, 245, 883 P.2d 663, 667 (App.1994) (citations and internal quotation marks omitted).

■ Viewing the evidence in this case in the light most favorable to the State, we discern testimony from both Cox and McGraw that Hoang struck Cox at least once with the pipe. It was the prerogative of the court, as the fact-finder, to believe this testimony, even in the face of Tasato's contrary insistence. Indeed, given Tasato's admission of a momentary lacuna in his view of the action, the contradictory evidence regarding the *actus reus* of the offense could well be reconciled in the ken of the finder of fact.

In this view of the evidence, moreover, there was ample evidence for a reasonable mind to conclude, beyond a reasonable doubt, that Hoang struck Cox with the pipe without justification and that he did so intentionally, knowingly or recklessly.

It was, again, the prerogative of the court to believe Cox's testimony that a blow from the pipe drove him to his knees or nearly so, and to unconsciousness or nearly so. The court could reasonably infer from this that the blow caused Cox's daily headaches, blackouts and vision problems. The court could even infer quite reasonably that such a blow would cause Cox pain, even though there was no evidence adduced at trial to that specific effect.

■ There was, we conclude, substantial evidence for the court to conclude beyond a reasonable doubt that Hoang committed assault in the third degree. Hence there was sufficient evidence adduced at trial to sustain Hoang's conviction. Hence we remand for a new trial.

## C. The Court Must Solicit Allocution Directly From The Defendant At Sentencing.

Though our disposition of this case renders further discussion unnecessary, we take up Hoang's last point on appeal in order to provide guidance on remand should Hoang be again convicted.

In this case, the court did not address Hoang personally regarding his right to allocution before sentencing. In both instances in which the subject came up, the court extended its invitation to counsel, not Hoang.

HRS § 706-604(1) (1993) requires that "[b]efore imposing sentence, the court shall afford a fair opportunity *to the defendant* to be heard on the issue of the defendant's disposition." (Emphasis supplied.).

Hawai'i Rules of Penal Procedure Rule 32(a) (1999) also requires that "[b]efore suspending or imposing sentence, *the court shall address the defendant personally* and afford a fair opportunity *to the defendant* and defendant's counsel, if any, to make a statement and present any information in mitigation of punishment." (Emphases supplied.).

We have held that the right to allocution is, in addition, a due process right protected by article I, section 5 of the Hawai'i State Constitution, *Chow,* 77 Hawai'i at 247, 883 P.2d at 669, and that there is "no effective or adequate manner in which a defendant's right of presentence allocution may be constitutionally realized than to affirmatively require that the trial court make direct inquiry of the defendant's wish to address the court before sentence is imposed." *Id.* (footnote omitted).

■ We are cognizant of the fact that Hoang was "very nervous . . . and anxious" at sentencing and that he wanted counsel to speak for him. However, in light of the beneficent purposes subserved by the right to allocution, *id.* at 250, 883 P.2d at 672, the court should not neglect its duty to inquire directly of the defendant regarding his right to allocution, simply because it would appear to be futile in the particular case. The court should never in any event underestimate the reassuring force of its direct invitation to speak in mitigation of sentence. For all of that, it is time well spent indeed to inquire of the defendant directly, "Do you, . . . [ (defendant's name) ] have anything to say before I pass sentence?" *Id.* at 248, 883 P.2d at 670.

## III. Disposition.

In light of the foregoing, we vacate the July 24, 1998 judgment, conviction and sentence and remand for a new trial consistent with this opinion.