211 P.3d 750

**Darrell N. KAPUWAI,**
**Respondent/Claimant–Appellant,**

v.

**CITY AND COUNTY OF HONOLULU, DEPARTMENT OF PARKS AND RECREATION, Petitioner/Employer–Appellee, Self–Insured.**

**No. 27915.**

Supreme Court of Hawai'i.

July 16, 2009.

Paul K. Hoshino, Deputy Corporation Counsel, for petitioner/employer-appellee, self-insured.

Herbert R. Takahashi and Danny J. Vasconcellos (of Takahashi Vasconcellos & Covert), Honolulu, for respondent/claimant-appellant.

MOON, C.J., and Circuit Judge KIM, Assigned by Reason of Vacancy; ACOBA, J., Concurring Separately, with whom DUFFY, J., joins; and NAKAYAMA, J., Dissenting.

Opinion by MOON, C.J., Announcing the Decision of the Court.

On March 3, 2009, this court accepted a timely application for a writ of certiorari, filed by petitioner/employer-appellee City and County of Honolulu, Department of Parks and Recreation (the City) on January 23, 2009, requesting that this court review the Intermediate Court of Appeals' (ICA) December 8, 2008 judgment on appeal, entered pursuant to its November 12, 2008 published opinion in *Kapuwai v. City & County of Honolulu*, 119 Hawai'i 304, 196 P.3d 306 (App.2008). Therein, the ICA vacated the February 6, 2006 decision and order of the Labor and Industrial Relations Appeals Board (LIRAB), which, in turn, had modified the decision of the director of the Department of Labor and Industrial Relations (director).

Briefly stated, respondent/employee-appellant Darrell N. Kapuwai—who was employed by the City as a mason—sustained a work-related injury to his right great toe. The City eventually accepted liability for Kapuwai's injury, and the director awarded Kapuwai, *inter alia*, benefits for 96 percent permanent partial disability (PPD) of his right great toe. The City appealed to the LIRAB, and the LIRAB modified the director's decision, concluding that Kapuwai was entitled to 4 percent PPD on the whole person. Additionally, the LIRAB denied Kapuwai's request for attorney's fees and costs, made pursuant to Hawai'i Revised Statutes (HRS) § 386–93(b) (1993), quoted *infra*. Kapuwai appealed the LIRAB's decision to the ICA, arguing that the LIRAB should have converted the "whole person" rating to a PPD rating of the great toe, pursuant to HRS § 386–32(a) (Supp.2001), quoted *infra*, and should have granted his request for attorney's fees and costs. On appeal, the ICA held that Kapuwai was entitled to a PPD award based on the impairment of his great toe as opposed to a whole person rating if the award for the former exceeded the award for the latter; thus, the ICA remanded the case

to the LIRAB for such determination. Based upon its remand of the case to the LIRAB, the ICA recognized that it could not decide the attorney's fees issue but, nevertheless, provided "guidance" to the LIRAB regarding the application of HRS § 386–93(b) on remand.

On application, the City essentially contends that the ICA erred: (1) by remanding Kapuwai's case to the LIRAB for a "determination of a [PPD] award based on an impairment of [Kapuwai's] great toe"; and (2) in its interpretation of HRS § 386–93(b). We agree with the ICA's rationale and ultimate disposition remanding the case to the LIRAB for a determination of a PPD award based on the impairment of Kapuwai's great toe and, therefore, affirm that portion of the ICA's opinion. However, as discussed more fully *infra*, we hold that the ICA erred in delving into the interpretation of HRS § 386–93(b) because, based on the ICA's remand of the case to the LIRAB, the issue of attorney's fees and costs was not ripe for decision. Accordingly, we vacate section II of the ICA's opinion relating to attorney's fees and costs.

## I. BACKGROUND

### A. Factual Background and Procedural History

As aptly summarized by the ICA:

Kapuwai was employed by . . . [the City] as a mason. He developed a bunion and calluses on his right great toe which were aggravated by wearing steel-toed shoes at work. On November 23, 2001, Kapuwai underwent surgery on his right foot that consisted of metatarsal osteotomy and distal phalangeal exostectomy. The surgery was not successful in alleviating the pain and sensitivity Kapuwai experienced in his right great toe. Kapuwai walked with a mild limp, had difficulty going up and down stairs, and had problems with balance. He gave up driving because he experienced twitching under his toe when stepping on the accelerator. The surgery left a scar and a flexion deformity of his right great toe.

The City accepted liability for Kapuwai's injury on October 28, 2002, and on December 1, 2002, the [d]irector ... ordered the City to pay for Kapuwai's necessary medical expenses as well as $5,421.25 in temporary total disability benefits.

In December 2003, Kapuwai was evaluated by [Wayne K. Nadamoto, M.D. (Dr. Nadamoto)] for permanent impairment. Dr. Nadamoto used the Fifth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides) in rating Kapuwai's impairment. Dr. Nadamoto applied the gait-derangement method rather that the range-of-motion method for assessing impairment under the Fifth Edition of the AMA Guides.[1] Based on the gait-derangement method, Dr. Nadamoto rated Kapuwai's impairment as a 7 percent PPD of the whole person.

A hearing was held before the [d]irector on the issues of permanent disability and disfigurement. The [d]irector credited Dr. Nadamoto's evaluation that Kapuwai suffered a 7 percent whole person disability. The [d]irector found that "[t]his percentage should properly be converted to an award for the great toe only as that was the site of the injury." The [d]irector used the Third Edition (Revised) of the AMA Guides to convert Dr. Nadamoto's 7 percent whole person disability rating to a 96 percent PPD of the right great toe, resulting in a PPD award of $19,954.56. The [d]irector also ordered the City to pay Kapuwai $800.00 for disfigurement, to pay

additional temporary total disability benefits, and to reimburse Kapuwai for the cost of Dr. Nadamoto's evaluation.

The City appealed the [d]irector's decision to the LIRAB on July 13, 2004. The LIRAB issued a pretrial order identifying the issues on appeal as:

1. What is the extent of permanent disability resulting from [Kapuwai's] work injury ...; [and]

2. What is the extent of disfigurement resulting from [Kapuwai's] work injury. . . .

At the City's request, [S.Y. Tan, M.D. (Dr. Tan)] conducted an independent medical examination of Kapuwai. Dr. Tan prepared a report and testified at the [hearing] held before the LIRAB on the City's appeal. Dr. Tan disagreed with Dr. Nadamoto's use of the gait-derangement method of assessing Kapuwai's impairment because Kapuwai's condition did not fit the criteria for using that method under the Fifth Edition of the AMA Guides. Dr. Tan concluded that the range-of-motion method, which was based on measuring the range of motion of the great toe, was the appropriate method to use.[2] Applying the range-of-motion method, Dr. Tan determined that Kapuwai had sustained a mild toe impairment equivalent to a 1 percent PPD of the whole person.

On February 6, 2006, the LIRAB entered a decision that modified the [d]irector's PPD award and affirmed the [d]irector's disfigurement award. The LIRAB credited Dr. Tan's opinion in

---

1. Specifically, Dr. Nadamoto determined that Kapuwai could not "be rated under the range of motion impairment value since [Kapuwai's injury was] not a degenerative condition and definitely caused a gait abnormality which [did] not strictly fall under Table 17–5 of the AMA Guide to Evaluation of Permanent Impairment 5th Edition since there [was] no document[ed] moderate-advanced arthritic changes to the hip, knee, or ankle."

2. Specifically, Dr. Tan stated in his report:
 With all due respect, I believe Dr. Nakamoto [sic] is incorrect in his analysis. Firstly, [r]ange of [m]otion impairment (which incorporates pain) should be the logical choice in this case, and this is specifically covered under Section 17.2f on page 533. The section makes no mention whatsoever regarding the require-

ment of a "degenerative condition" as stated by Dr. Nakamoto [sic]. Secondly, the use of Table 17-5 to calculate impairment in this case violates the expressed conditions precedent. Section 17.2c (Gait Derangement) on page 529 specifically notes that "... the percentages given in Table 17–5 are for full-time gain derangements of persons who are dependent on **assistive devices** (bold font in text). Furthermore, the relevant paragraph (mild severity under a) is applicable only to patients with documented moderate to advanced arthritic changes of hip, knee[,] or ankle. Table 17–5 is inapplicable to the claimant ... Kapuwai because he neither uses assistance devices, nor does he have arthritic changes in the hip, knee, or elbow." (Emphasis in original.)

finding [(]1) that Kapuwai should be rated under the range-of-motion method and [(]2) that[,] under the Fifth Edition to the AMA Guides, Kapuwai's range of motion measurements corresponded to a 1 percent impairment of the whole person. The LIRAB also credited Kapuwai's testimony on "how his toe condition has interfered with his activities of daily living, such as walking, going up and down stairs, driving, and standing."

The LIRAB concluded:

> Based on the foregoing, including Dr. Tan's impairment rating and [Kapuwai's] testimony regarding his pain symptoms and how his toe condition has interfered with his activities of daily living, we conclude that [Kapuwai] is entitled to benefits for 4 [percent] permanent partial disability of the whole person....

The LIRAB's decision did not separately determine what Kapuwai's PPD award would have been if based solely on the impairment to his right great toe. The LIRAB agreed with the [d]irector's $800 disfigurement award.

[On February 16, 2006,] Kapuwai moved for reconsideration on the ground that the LIRAB failed to convert its award of 4 percent PPD of the whole person to an award based on the impairment of his right great toe, a specific body part covered by the schedule of awards for PPD under HRS § 386–32(a)[3]. The LIRAB denied Kapuwai's motion for reconsideration on March 29, 2006.

Kapuwai also submitted a request to the LIRAB that the City be required to pay $2,535, [pursuant to HRS § 386–93(b),[4]] which represented one-half of the attorney's fees and cost[s] incurred by Kapuwai in the City's appeal to the LIRAB. In support of his request, Kapuwai argued that the City raised two issues in the appeal (the extent of the PPD award and the extent of the disfigurement award); that Kapuwai was the prevailing party on the issue of disfigurement; and that the LIRAB did not reverse but only modified the

---

3. HRS § 386–32(a) provides in relevant part that:

> Where a work injury causes permanent partial disability, *the employer shall pay the injured worker compensation in an amount determined by multiplying the effective maximum weekly benefit rate prescribed in section 386–31 by the number of weeks specified for the disability as follows:*
> ....
> *Great toe. For the loss of a great toe, thirty-eight weeks;*
> ....
> Loss of use. Permanent loss of the use of a hand, arm, foot, leg, thumb, finger, toe, or phalanx shall be equal to and compensated as the loss of a hand, arm, foot, leg, thumb, finger, toe, or phalanx;
> Partial loss or loss of use of member named in schedule. Where a work injury causes permanent partial disability resulting from partial loss of use of a member named in this schedule, and where the disability is not otherwise compensated in this schedule, compensation shall be paid for a period that stands in the same proportion to the period specified for the total loss or loss of use of the member as the partial loss or loss of use of that member stands to the total loss or loss of use thereof;
> ...
> Other cases. In all other cases of permanent partial disability resulting from the loss or loss of use of a part of the body or from the impairment of any physical function, weekly benefits shall be paid at the rate and subject to the limitations specified in this subsection for a period that bears the same relation to a period named in the schedule as the disability sustained bears to a comparable disability named in the schedule. In cases in which the permanent partial disability must be rated as a percentage of the total loss or impairment of a physical or mental function of the whole person, the maximum compensation shall be computed on the basis of the corresponding percentage of the product of three hundred twelve times the effective maximum weekly benefit rate prescribed in section 386–31.

(Emphases added.)

4. In 2001—the date that Kapuwai became permanently disabled—HRS 386–93(b) provided in relevant part that:

> *If an employer appeals a decision of the director or appellate board, the costs of the proceedings* of the appellate board or the supreme court of the State, *together with reasonable attorney's fees shall be assessed against the employer, if the employer loses;* provided that if an employer or an insurance carrier, other than the employer who appealed, is held liable for compensation, the costs of the proceedings of the appellate board or the supreme court of the State together with reasonable attorney's fees shall be assessed against the party held liable for the compensation.

(Emphases added.)

[d]irector's decision on the issue of PPD. The LIRAB effectively denied Kapuwai's request by not assessing the City with 50 percent of Kapuwai's attorney's fees and costs, but instead making Kapuwai's attorney's fees and costs a lien upon the compensation payable by the City to Kapuwai. *Kapuwai*, 119 Hawai'i at 307–08, 196 P.3d at 309–10. On April 28, 2006, Kapuwai filed a timely notice of appeal from the LIRAB's (1) February 6, 2006 decision and order and (2) March 29, 2006 order denying Kapuwai's motion for reconsideration.

B. *Appeal Before the ICA*

On direct appeal, Kapuwai contended that the LIRAB erred "as a matter of law" when it "failed to 'convert' its award of 4 [percent] PPD of the 'whole person' to an award of the right great toe under the 'schedule' of injuries pursuant to [HRS] § 386–32(a)." Specifically, Kapuwai argued that:

Where an injured worker suffers a work injury which causes permanent partial disability to his/her great toe [HRS § 386–32(a) ] mandates that " . . . an employer **shall** pay the scheduled amount determined by multiplying the effective maximum weekly benefit rate prescribed in § 386–31, HRS" by "38 weeks" as identified in the "schedule." By the use of the word "shall," it is clear that the Hawai'i Legislature determined that the payment of . . . [PPD] benefits pursuant to the "scheduled" amount are mandatory in nature requiring that certain "compulsory action" be taken. The "compulsory action" required by the LIRAB was to "convert" the "4 [percent] PPD of the whole person" to a PPD award of the scheduled injury, that being "great toe."

(Bold emphasis in original.) (Internal citations omitted.) Moreover, Kapuwai asserted that the AMA Guides, Third Edition, should be used in converting the PPD award from 4 percent whole person permanent partial impairment to a percentage of an impairment of the right great toe. According to Kapuwai, under the AMA Guides, the 4 percent whole person award would be converted to a "73 [percent] permanent partial impairment through 90 [percent] permanent partial impairment for a PPD award within the range

of \$15,173.78 through \$18,707.40." Kapuwai further argued that, "[w]here two remedies are available (*i.e.*, lower percentage within the range of 73 [percent] to 90 [percent] ), . . . Kapuwai should receive the benefit of the most favorable remedy (*i.e.*, 90 [percent] PPD of the right great toe)." He contended that this "most favorable remedy" approach was "consistent with the benevolent purpose and scope of Hawaii's workers' compensation law."

Kapuwai additionally contended that the LIRAB erred in denying his request for attorney's fees and costs. Specifically, Kapuwai argued that the LIRAB should have ordered the City to pay his costs and 50 percent of his attorney's fees because HRS § 386–93(b) reflects the legislature's intention to

relieve a claimant of the burden of paying attorney's fees and costs where an employer appeals and the non-appealing employer or insurance carrier is held liable for compensation due to the claimant. Moreover, the legislative history clearly indicates that the appealing employer should pay for costs and fees "even where he does not lose the appeal." This "may happen when an employer appeals on the grounds that the amount of compensation is excessive and succeeds in having the amount reduced." Under this bill, "the appealing employer would be required to pay such costs and fees." . . . The [l]egislature['s] reference to the appealing employer to be [sic] "required to pay such costs and fees" could only refer to the situation now at hand.

The City responded that the LIRAB correctly awarded Kapuwai 4 percent PPD of the whole person inasmuch as it "was not compelled or obligated to convert its award of 4 [percent] PPD of the whole person to that of the right great toe because use of . . . [the HRS § ]386–32 . . . schedule is not exclusive when an injury is not clean cut and there are complications to other parts of the body," that is, Kapuawai's injury caused him to have an unsteady gait and permanent limp and interfered with his daily living activities. As such, the City maintained that the LIR-

AB correctly awarded Kapuwai PPD based on his whole person. Additionally, the City contended that the LIRAB did not abuse its discretion in failing to order it to pay Kapuwai's attorney's fees and costs because "[the City] prevailed on the crucial issue of PPD on appeal and [was] the prevailing party under [HRS § ]386–93(b)."

On November 12, 2008, the ICA issued its opinion, concluding that Kapuwai was entitled to a PPD award based on the impairment of his great toe if that award is determined to exceed an award based on the impairment of his whole person. *Kapuwai*, 119 Hawai'i at 306–07, 196 P.3d at 308–09. In reaching such conclusion, the ICA relied on this court's decision in *Respicio v. Waialua Sugar Co.*, 67 Haw. 16, 675 P.2d 770 (1984), wherein we adopted the trend of "departing from the exclusiveness of scheduled allowances" and held that, under HRS § 386–32(a), "[b]enefits will be limited to schedule amounts if the loss is 'clean cut,' *i.e.*, where there are no complications to other parts of the body" but "[l]oss of a smaller member may be treated as a percentage loss of a larger member if the effects of the loss extend to other parts of the body." 67 Haw. at 18, 675 P.2d at 772 (citation omitted). The ICA determined that *Respicio* applied to the case at bar and concluded that, inasmuch as "[t]here was evidence in the record that the effects of Kapuwai's great toe injury extended to and interfered with the efficiency of other parts of the body and his whole person[,] ... the LIRAB was not limited to basing its PPD award on the impairment of Kapuwai's great toe, but could determine the extent to which the effects of Kapuwai's great toe injury resulted in the impairment of his whole person." *Kapuwai*, 119 Hawai'i at 311, 196 P.3d at 313.

However, the ICA ultimately concluded that HRS § 386–32(a) entitled Kapuwai "to a PPD award based on the impairment of his great toe *if that [award] exceeds the LIRAB's current award based on the impairment of his whole person.*" *Id.* (emphasis added). Inasmuch as "[t]he LIRAB did not

determine what Kapuwai's PPD award would have been if based on the impairment of his great toe under the HRS § 386–32(a) schedule," the ICA could not itself "tell if an award based on the impairment of Kapuwai's great toe would exceed the amount awarded by the LIRAB based on the PPD of Kapuwai's whole person." *Id.* Accordingly, the ICA vacated the LIRAB's decision and remanded the case to the LIRAB for a determination of a PPD award based on the impairment of Kapuwai's great toe as requested by him.[5] *Id.* at 306–07, 196 P.3d at 308–09.

Based upon its decision to remand the case to the LIRAB for further proceedings, the ICA recognized that it could not "decide" Kapuwai's remaining contention regarding the LIRAB's denial of his requested attorney's fees and costs because "[t]he determination of whether the City is the loser of its appeal to the LIRAB under HRS § 386–93(b) must be based on the final decision of the LIRAB." *Id.* at 313, 196 P.3d at 315 (citation omitted). Inasmuch as the ICA vacated the LIRAB's decision and order, there was no final decision upon which the award of attorney's fees and costs could be based. Despite the ICA's recognition that it could not "decide" the issue of attorney's fees, it, nevertheless, opined on the application of HRS § 386–93(b) to "provide guidance ... to assist the LIRAB on remand." *Id.* at 306, 196 P.3d at 308.

Specifically, the ICA, after conducting a review of the legislative history of HRS § 386–93(b), stated:

> We conclude that[,] when an employer does not dispute the compensability of the employee's injury and only appeals on the ground that a PPD award is excessive, it should be regarded as the loser under HRS § 386–93(b) if it fails to obtain a substantial reduction in the compensation award. In our view, this test is faithful to both the language of HRS § 386–93(b), which only permits the assessment of attorney's fees and costs against an appealing employer "if the employer loses," and the legislative purpose to discourage un-

---

5. However, the ICA declared that it did "not agree with Kapuwai's contention that, where the AMA Guides provide a range of percentages for an impairment, the rating physician and the LIRAB must select the highest percentage in the range." *Id.* at 312, 196 P.3d at 314.

necessary appeals and avoid unfairly burdening an employee with the costs of defending against an appeal. The test was derived by construing the language of HRS § 386-93(b) within the context and spirit of the workers' compensation law.

The crucial issue in the type of case presented here is the amount of compensation the employer is required to pay. The employer does not prevail on this issue if it only obtains a minor or insubstantial reduction in the award. In determining whether the employer has achieved a substantial reduction in the award, the LIRAB should consider both the relative and absolute amount of the reduction. For example, if the employer appeals only a small compensation award, a large percentage reduction in the award may not be sufficient to avoid the assessment of the employee's attorney's fees and costs. As noted, we do not agree with Kapuwai's contention that the employer should automatically be regarded as the loser on appeal if it fails to obtain the full reduction it requested. In construing a different attorney's fees statute, the Hawai'i Supreme Court has held that "where a party prevails on the disputed main issue, even though not to the extent of his original contention, he will be deemed to be the successful party for the purpose of taxing costs and attorney's fees." *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 620, 575 P.2d 869, 879 (1978). However, we believe the LIRAB may consider the position taken by the employer on appeal as a factor in its determination of whether the employer is the loser and has achieved a substantial reduction in the award.

*Id.* at 318-19, 196 P.3d at 320-21.

The ICA entered its judgment on appeal on December 8, 2008. On January 23, 2009, Kapuwai timely filed his application for a writ of certiorari. The City filed a response on February 6, 2009. This court accepted Kapuwai's application on March 3, 2009.

## II. STANDARDS OF REVIEW

### A. Agency Decisions

Appellate review of the LIRAB's decision is governed by HRS § 91-14(g) (1993), which provides:

Upon review of the record[,] the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91-14(g), conclusions of law (COLs) are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3).

A COL is not binding on an appellate court and is freely reviewable for correctness. Thus, the court reviews COLs *de novo*, under the right/wrong standard.

*Tam v. Kaiser Permanente*, 94 Hawai'i 487, 494, 17 P.3d 219, 226 (2001) (citations, original brackets, and ellipsis omitted) (format altered).

### B. Ripeness

 It is axiomatic that ripeness is an issue of subject matter jurisdiction. "Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo.*" *Kaho'ohanohano v. Dep't of Human Servs.*, 117 Hawai'i 262, 281, 178 P.3d 538, 557 (2008) (citation omitted).

## III. DISCUSSION

 As previously indicated, the City contends on application that the ICA erred in: (1) ruling "that it was necessary to remand

this case for the [LIRAB's] determination of a[PPD] award based on an impairment of [Kapuwai's] great toe" and (2) concluding that "an employer is regarded as the loser on appeal if it fails to obtain a substantial reduction of the compensation award." At the outset, we hold that the City's contention regarding remand to the LIRAB is without merit inasmuch as we agree with the ICA's rationale supporting its ultimate conclusion that (1) Kapuwai's case should be remanded to the LIRAB for a determination of a PPD award based on the impairment of Kapuwai's great toe and that, (2) as between the awards for the great toe and the whole person, Kapuwai is entitled to the greater. *Kapuwai*, 119 Hawai'i at 311, 196 P.3d at 313. However, we are concerned about the liberty taken by the ICA to provide guidance with respect to HRS § 386–93(b) (dealing with liability for attorney's fees and costs) in light of its decision to remand the case to the LIRAB for further proceedings.

As indicated above, the ICA stated that it would not "decide" the issue whether Kapuwai was entitled to attorney's fees and costs because "[t]he determination of whether the City is the loser of its appeal to the LIRAB under HRS § 386–93(b) must be based on the final decision of the LIRAB," which decision will presumably be issued after remand. *Kapuwai*, 119 Hawai'i at 313, 196 P.3d at 315 (citation omitted). Nevertheless, the ICA, in its opinion, set forth "guidance on how to interpret HRS § 386–93(b)," *id.*, which, in our view, renders that portion of the opinion advisory because the issue of attorney's fees and costs was not ripe for decision.

▋ Preliminarily, we acknowledge that neither party has challenged the advisory nature of the ICA's opinion, *i.e.*, that the issue of attorney's fees and costs was not ripe for decision. However, we are equally cognizant that this court has previously stated that,

[w]hile the courts of the State of Hawai'i are not bound by a "case or controversy" requirement, we nonetheless recognize that the " 'prudential rules' of judicial self-governance 'founded in concern about the proper—and properly limited—role of courts in a democratic society' are always of relevant concern." *Life of the Land v. Land Use Commission*, 63 Haw. 166, 172, 623 P.2d 431, 438 (1981) (citations omitted). For "*even in the absence of constitutional restrictions, courts must still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting.*" *Id.*

*State v. Fields*, 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984) (emphasis added) (footnote and brackets omitted). Additionally, we have previously indicated that, in "the absence of ripeness," appellate courts are "without jurisdiction to consider [the] appeal." *State v. Moniz*, 69 Haw. 370, 373, 742 P.2d 373, 376 (1987) (holding that "appellate courts are under an obligation to insure that they have jurisdiction to hear and determine each case" and, "because of the absence of ripeness and standing, [this court was] without jurisdiction to consider [an] appeal").[6] Moreover, it is well-settled in this jurisdiction that, "[i]f the parties do not raise the issue [of a lack of subject matter jurisdiction], a court *sua sponte* will." *Tamashiro v. Dep't of Human Servs., State of Hawai'i*, 112 Hawai'i 388, 398, 146 P.3d 103, 113 (2006) (emphasis added) (citations omitted). "When reviewing ... whether the lower court has jurisdiction, [our appellate courts] retain jurisdiction, not on the merits, but only for the purpose of correcting the error in jurisdiction." *Id.* (citation, internal quotation marks, and original brackets omitted). Thus, we may properly raise the issue of ripeness *sua sponte* and, additionally, retain jurisdiction for the limited purpose of correcting the ICA's error in jurisdiction.

6. In the federal court system (which—unlike the ICA and this court—is bound by the federal constitution's Article III case and controversy requirement), it is well-established that:

Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed. This deficiency may be raised *sua sponte* if not raised by the parties.

*Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990), *cert. denied*, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991) (citation omitted).

In light of the ICA's remand, the LIRAB has yet to make a final decision on the underlying worker's compensation claim. As such, any determination whether the employer "loses" and, thus, is required to pay attorney's fees and costs is premature, *i.e.*, not ripe. Accordingly, we conclude that, inasmuch as there is no current "controversy" over attorney's fees and costs, the ICA's issuance of an advisory opinion on an unripe issue implicates concerns "about the proper—and properly limited—role of courts in a democratic society" and contravenes the "prudential rules of judicial self-governance." *Fields*, 67 Haw. at 274, 686 P.2d at 1385. The dissent, however, disagrees with our conclusion inasmuch as it believes that "this court has also issued advisory opinions in the past" and that the majority in this case has not "explain[ed] why we may issue advisory opinions and the ICA ... cannot." Dissenting op. at 52, 53–54, 211 P.3d at 769, 770–71. In support of its argument, the dissent points to a number of cases wherein this court has provided guidance to the trial courts on remand.

Although the dissent is correct, it overlooks an important distinction between the cases it cites and the case at bar. Specifically, in the cases cited by the dissent, this court provided guidance to another court, *i.e.*, an entity within the same branch of government; whereas, in the instant case, the ICA provided guidance to the LIRAB, an administrative agency within the coequal executive branch of government, which, as discussed more fully *infra*, raises serious concerns regarding separation of powers, judicial interference, and premature adjudication.

In the context of the premature review of administrative decisions, we have stated that:

The rationale underlying the ripeness doctrine and the traditional reluctance of courts to apply injunctive and declaratory remedies to administrative determinations *is to prevent courts, through avoidance of* **premature adjudication, from entangling** *themselves in abstract disagreements over administrative policies, and also to* **protect the agencies from judicial interference until an administrative decision** *has been formalized and its effect felt in a concrete way by the challenging parties.* Thus, prudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society, **considerations flowing from our coequal and coexistent system of government**, dictate that we accord those charged with drafting and administering our laws a reasonable opportunity to craft and enforce them in a manner that produces a lawful result.

*Save Sunset Beach Coal. v. City & County of Honolulu*, 102 Hawai'i 465, 483, 78 P.3d 1, 19 (2003) (emphases added) (format altered) (citations, internal quotation marks, and original brackets omitted). In our view, the foregoing rationale clearly recognizes the separation of powers doctrine as it relates to the adjudication of matters reserved for administrative agencies in the other branches of government. In other words, the administrative agency of a separate, coequal branch of government should be accorded the opportunity to first decide and enforce its own decisions without the premature interference by the judiciary.

None of the cases cited by the dissent involve this court's issuance of an advisory opinion providing guidance to an administrative agency or entity within the executive or legislative branches or within county government. In fact, this court, in *Save Sunset Beach*, declined to issue an opinion regarding challenges to a proposed use of the county zoning district because the issue was not ripe. 102 Hawai'i at 482–83, 78 P.3d at 18–19. Likewise, the ICA, in *Bremner v. City & County of Honolulu*, 96 Hawai'i 134, 28 P.3d 350 (App.2001), refused to decide a constitutional challenge to a county zoning ordinance because the ordinance had not yet been implemented, and the issue was, therefore, again not ripe for adjudication. *Id.* at 143–44, 28 P.3d at 359–60. Implicit in these cases is the demonstration of the appellate courts exercising restraint and *not* prematurely delving into areas committed to the other branches of government—a principle recognized by this court in *Fields*.

In *Fields*, this court was faced with the issue whether a condition of probation con-

travened the defendant's constitutional right to be free of unreasonable searches and seizures. 67 Haw. at 271–73, 686 P.2d at 1384–85. Specifically, the probation condition imposed upon the defendant made her "subject at all times during the period of her probation to a warrantless search of her person, property and place of residence for illicit drugs and substances by any law enforcement officer including her probation officer." *Id.* at 273, 686 P.2d at 1384. The *Fields* court recognized that, inasmuch as the government had not yet made an effort to enforce the particular condition of probation, the ripeness doctrine, if strictly applied to the situation at bar, would "preclude an adjudication of the issue raised on appeal." *Id.* at 275, 686 P.2d at 1386. Nevertheless, this court determined that "[o]ther important considerations" led it "to believe [it was] confronted with the exceptional case demanding attention in advance of an actual attempt by the government to enforce the condition." *Id.* Specifically, this court declined to apply the ripeness doctrine inasmuch as: (1) "the deprivation of a fundamental right may not be lightly regarded, even when exacted as part of the price of conditional release"; and (2) the probationary condition at issue was a creature of judicial ingenuity and that, therefore, its *"inquiry would focus on the propriety of judicial action[, and that it] would not be venturing 'into areas committed to other branches of government.'"* *Id.* at 275–76, 686 P.2d at 1386 (citation omitted). Based on the foregoing, the *Fields* court concluded that it was appropriate "to act before there [was] an attempt to enforce the sentencing court's order, *since [its] bounden duty include[d] the prevention of serious judicial mistakes* in situations where resort to appeal may be otherwise foreclosed." *Id.*

Indeed, the guidance provided by this court in nine of the eleven cases cited by the dissent focused on the propriety of judicial action or the deprivation of constitutional rights, and none ventured into areas committed to other branches of government. *See, e.g., State v. Nichols,* 111 Hawai'i 327, 340, 141 P.3d 974, 987 (2006) (providing guidance to the circuit court on remand regarding *jury instructions* ); *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 141 P.3d 427 (2006) (providing guidance to the circuit court regarding the correct application of a statute on remand); *KNG Corp. v. Kim,* 107 Hawai'i 73, 110 P.3d 397 (2005) (providing guidance to the circuit court on remand that statute did not violate the *due process or equal protection clause* ); *Gap v. Puna Geothermal Venture,* 106 Hawai'i 325, 104 P.3d 912 (2004) (providing guidance to the circuit court on remand with regard to setting of appropriate sanctions pursuant to *Hawai'i Rules of Civil Procedure Rules 11 and 16,* which rules are promulgated by the supreme court); *Ditto v. McCurdy,* 102 Hawai'i 518, 78 P.3d 331 (2003) (providing guidance regarding writs of execution and the applicability of the *district court rules,* which are also promulgated by the supreme court); *State v. Wakisaka,* 102 Hawai'i 504, 78 P.3d 317 (2003) (providing guidance to the circuit court regarding *evidentiary matters, i.e.,* the exclusion of an expert witness); *State v. Culkin,* 97 Hawai'i 206, 35 P.3d 233 (2001) (addressing *evidentiary matters* to provide guidance to the circuit court on remand); *State v. Mahoe,* 89 Hawai'i 284, 972 P.2d 287 (1998) (providing guidance to the circuit court on remand regarding a *jury instruction* ); *State v. Kauhi,* 86 Hawai'i 195, 948 P.2d 1036 (1997) (addressing unripe *evidentiary and constitutional issues* ).

With respect to the two remaining cases cited by the dissent, to wit: *E & J Lounge Operating Co., Inc. v. Liquor Commission of City & County of Honolulu,* 118 Hawai'i 320, 350, 189 P.3d 432, 462 (2008), and *In re Water Use Permit Applications,* 105 Hawai'i 1, 12, 93 P.3d 643, 654 (2004), we fail to see how those cases constitute advisory opinions on unripe issues. In both cases, this court decided issues squarely presented and necessary for a full and complete discussion of its ultimate holding in each case. It did not address any unripe issues or provide guidance to a separate government agency.

Based on the foregoing, we believe the dissent's citations to the above cases as support for its position that the ICA's advisory opinion in this case should be allowed to stand because this court has also issued advisory opinions in the past is unavailing. This court's issuance of previous advisory opin-

ions, as cited by the dissent, is consistent with this court's prior case law and practice of limiting its guidance to entities within the judicial branch while refraining from doing so in cases involving a separate governmental entity.

We agree, however, with the dissent that the determination whether it is the LIRAB or the appellate courts that awards attorney's fees and costs depends on when the appeal is "final." Dissenting op. at 54, 211 P.3d at 771 (citing *Lindinha,* 104 Hawai'i at 171, 86 P.3d at 980 (stating "we read [HRS § 386–93(b)] as assessing fees and costs against an employer if the employer loses *the final appeal*" (emphasis added))). In other words, "the statute plainly authorizes assessment of attorney's fees and costs against the employer if it loses, whether the case *ends* in the LIRAB or this court." *Id.* (emphasis added). By providing that "the costs of proceedings of *the appellate board or the supreme court of the State,* together with reasonable attorney's fees shall be assessed against the employer, if the employer loses," HRS § 386–93(b) (emphasis added), the legislature clearly contemplated that proceedings could end and be final at the LIRAB-level, thereby empowering the LIRAB to make an award of attorney's fees and costs "if the employer loses."

We disagree, however, with the dissent's position that it was permissible for the ICA to provide guidance to the LIRAB because "the plain language of HRS § 386–93(b) applies to the judicial branch of the government in the same manner as the executive branch." Dissenting op. at 54, 211 P.3d at 771. The fact that the statute applies to both the judicial and executive branches does not render it permissible for the judicial branch to interfere with the decision-making process of an executive branch agency simply because the statute bestows the same decision-making authority upon the judicial branch. Because an appeal from a decision of the director can, depending on the circumstances, become "final" at the LIRAB-level or the appellate-level, the statute must necessarily contemplate those circumstances.

In the present case, the appeal at the LIRAB-level was *not* final because Kapuwai appealed to the ICA and the City further appealed to this court. Likewise, the appeal at the ICA and this court was also *not* "final" for purposes of attorney's fees and costs in light of the remand to the LIRAB for further proceedings regarding Kapuwai's PPD award. Once the LIRAB makes such determination and, if no further appeal is taken, then, the "final appeal" would have occurred at the LIRAB-level, empowering it to make the requisite determination and award of fees and costs. By opining on the application of the subject statute, the ICA invaded the province of the LIRAB to make its own independent assessment as to whether the City, under HRS § 386–93(b), is the "lose[r]" for purposes of an award of attorney's fees and costs. As such, the ICA impermissibly ventured into an area legislatively committed to the LIRAB and, thus, implicates separation-of-powers concerns that were not present in the decisions cited by the dissent.

Finally, the dissent also maintains that, if "the ICA lacked jurisdiction because the attorney's fees and costs issue is unripe, then it logically follows that we too lacked jurisdiction to issue the advisory opinions that we did." Dissenting op. at 54, 211 P.3d at 771 (citation omitted). However, as discussed *supra,* the guidance provided by this court in the cases cited by the dissent (1) focused on the propriety of judicial action or the deprivation of constitutional rights, (2) did not venture into areas committed to other branches of government, thereby obviating any separation-of-power concerns, and (3) were consistent with its "bounden duty" to prevent judicial mistakes or the reoccurrence of a judicial mistake on remand. *Fields,* 67 Haw. at 276, 686 P.2d at 1386.

In sum, we conclude that the ICA's opinion regarding the issue of attorney's fees and costs was not ripe for decision and constitutes an advisory opinion akin to the issuance of an opinion where there is no subject matter jurisdiction. *Moniz,* 69 Haw. at 373, 742 P.2d at 376. More importantly, the advisory portion of the ICA's opinion constitutes inappropriate judicial interference with an administrative decision of an entity within a separate, coequal branch of government that has not been formalized and has not yet affected

the challenging parties in a concrete way, *Save Sunset Beach*, 102 Hawai'i at 483, 78 P.3d at 19, thereby implicating separation-of-powers concerns. Consequently, we hold that the ICA's exercise of appellate power in this case constitutes error that must be corrected by this court by vacating the advisory section of the ICA's opinion.

## IV. CONCLUSION

Based on the foregoing, we vacate the part of the ICA's opinion, specifically section II, that deals with the issue of attorney's fees and costs.

Concurring Opinion by ACOBA, J., in which DUFFY, J., joins.

I concur that the test set forth by the Intermediate Court of Appeals (the ICA) in regard to calculating attorney's fees "when an employer . . . appeals on the ground that a [permanent partial disability (PPD) ] award is excessive," *Kapuwai v. City & County of Honolulu*, 119 Hawai'i 304, 318, 196 P.3d 306, 320 (App.2008), addressed an issue that was not ripe for decision, inasmuch as the application of the test could be entirely unnecessary. I write separately to address the points in the dissenting opinion that (1) neither Respondent/Claimant–Appellant Darrell N. Kapuwai (Respondent) nor Petitioner/Employer–Appellee City and County of Honolulu (Petitioner) raised the issue of ripeness, and, thus, it should not be addressed by this court, *see* dissent at 57–58, 211 P.3d at 774–75, and (2) "this court has also issued advisory opinions in the past[,]" *id.* at 52, 211 P.3d at 769, and therefore "the majority's opinion brings into question the enforceability of some of our past judgments," *id.* at 54, 211 P.3d at 771. Although the dissent asserts the cases it cites are "quite relevant here, notwithstanding the concurring opinion's novel [1] approach at distinguishing each of

---

1. The dissent contends that the approach taken herein is "novel." Dissent at 57, 211 P.3d at 774 n. 2. But, examining each of the cited cases by contrasting it to the instant case is no more "novel" than the methodology applied by the dissent itself. In the approach taken by the dissent, no categories are established; rather, the dissent cites to a wide variety of cases, similar only in the respect that the appellate court decid-

them from the instant case[,]" *id.* at 56 n. 2, 211 P.3d at 773 n. 2, it fails to show how the dissent's cases soundly stand for the proposition that vacation of the ICA's opinion "brings into question the enforceability of some of our past judgments," *id.* at 53–54, 211 P.3d at 770–71, in light of the marked differences between the instant case and the dissent's cases. The dissent mistakes situations where multiple ripe issues are presented for decision, with the situation presented in this case, wherein resolution of one issue upon remand is preliminary to decision of the other, and thus, the ripeness of the separate issue is dependent on subsequent resolution of the preliminary issue. The former situation does not raise any jurisdictional objections, whereas the latter poses a ripeness problem.

## I.

In this case, the Director of the Department of Labor and Industrial Relations (the Director) found that Respondent suffered 7 percent whole person PPD and converted that "to a 96 percent . . . right great toe [PPD], resulting in a PPD award of $19,954.56." *Kapuwai*, 119 Hawai'i at 307, 196 P.3d at 309. Petitioner appealed the PPD award to the Labor and Industrial Relations Appeals Board (the LIRAB), which "conclud[ed] that [Respondent] is entitled to benefits for 4 [percent whole person PPD]. . . . The LIRAB's decision did not separately determine what [Respondent's] PPD award would have been if based solely on the . . . right great toe [PPD]." *Id.* at 308, 196 P.3d at 310.

Respondent presented two issues on appeal to the ICA: (1) "the LIRAB erred as a matter of law when it failed to 'convert' its award of 4[percent whole person PPD] to an award of the right great toe [PPD] under the 'schedule' of injuries pursuant to [Hawai'i

---

ed more than one issue on appeal. The cases the dissent cites are patently distinguishable from the present case because ripeness principles were not violated in those cases and they involved real controversies with concrete facts. Where the rights of numerous future litigants will be affected by a new test, those litigants should have the benefit of having had the test first applied to an actual set of facts, rather than in the abstract.

Revised Statutes (HRS) § ] 386–32(a) [ (Supp.2008) ]"; and (2) "the LIRAB erred as a matter of law and/or exceeded its limit of discretion in *denying [Respondent's] request under [HRS § ]386–93(b) [ (Supp. 2008)²] for assessment of 50% of [Respondent's] request for attorney's fees and costs against [Petitioner.]*" (Emphasis added.)

As to the first issue, the ICA "conclude[d] that [Respondent was] entitled to a PPD award based on ... his [right] great toe [PPD] if that exceed[ed] an award based on ... his whole person [PPD,]" and "therefore vacate[d] the LIRAB's decision and remand[ed] the case for a determination of a PPD award based on the impairment of [Respondent's] great toe[.]" *Id.* at 306–07, 196 P.3d at 308–09. As to the second issue, *the ICA itself recognized that because the case was remanded on the PPD issue, the issue of whether to award attorney's fees and costs to Respondent was not yet ripe for decision:*

> *Because we are remanding the case for further proceedings, we do not decide [Respondent's] claim that the LIRAB erred in denying his request to assess one-half of his attorney's fees and costs against his employer pursuant to HRS § 386–93(b) [ ].* That statute provides for the assessment of attorney's fees and costs against the employer, if the employer appeals to the LIRAB or the appellate court and "loses."

*Id.* at 307, 196 P.3d at 309 (emphasis added). Nevertheless, the ICA went on to craft a test to determine whether an employer has lost its appeal for purposes of awarding attorney's fees to the employee in the event that an employer remains liable for some portion of the employee's injury. *Id.* at 318, 196 P.3d at 320.

However, because the ICA vacated the decision of the LIRAB and "remand[ed] the case for a determination of a PPD award based on the impairment of [Respondent's] great toe[,]" *id.* at 311, 196 P.3d at 313, there

was no longer a PPD award on which the ICA could base its analysis of attorney's fees. This court has stated that

> [t]he duty of this court, as of every other judicial tribunal, is *to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.*
>
> Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so.

*Wong v. Bd. of Regents,* 62 Haw. 391, 394–95, 616 P.2d 201, 204 (1980) (internal citations omitted) (emphasis added).

At the point the ICA decided to remand, its discussion of HRS § 386–93(b) became merely an opinion on an abstract proposition. This is illustrated by the fact that there are two possible outcomes on remand to the LIRAB. The first is that Respondent's PPD award based on the LIRAB's conversion of his whole person PPD to his great toe PPD either remains the same as the award provided by the Director, or is increased, in which case the test with respect to attorney's fees set forth by the ICA *would not be applied at all,*³ because Respondent would manifestly be the "winner" on appeal to the LIRAB. The second is that Respondent's award is reduced, in which case the test set forth by the ICA would be relevant to the determination of whether Respondent is entitled to attorney's fees. There is no way of predicting or knowing which one of the two possible alternatives would occur on remand. Therefore, any test formulated by the ICA at this point is premature. The matter then was unripe for decision, and in "the absence of ripeness[,]" appellate courts "are without jurisdiction to consider [an unripe issue] on appeal." *State v. Moniz,* 69 Haw. 370, 373, 742

---

2. HRS § 386–93(b) states in relevant part that "*[i]f an employer appeals* a decision of the director or appellate board, the costs of the proceedings of the appellate board or the appellate court, together with *reasonable attorney's fees, shall be assessed against the employer if the employer loses*[.]" (Emphases added.)

3. The ICA noted that "a direct conversion of the LIRAB's 4 percent whole person PPD rating into a great toe PPD rating may not be appropriate." *Kapuwai,* 119 Hawai'i at 312, 196 P.3d at 314. Therefore, even though the LIRAB found a lower whole person PPD rating than the Director, it is possible that it could find a great toe PPD rating equal to or greater than that of the Director.

P.2d 373, 376 (1987). As such, the ICA lacked jurisdiction to decide the issue in this case.

## II.

The dissent does not argue that the attorney's fees issue for which the ICA crafted its test was ripe for decision. Therefore, it apparently agrees that the issue was not ripe. Instead, as stated above, the dissent maintains that "the ripeness issue . . . is likewise unripe because none of the parties have argued [ripeness] before this court." Dissent at 58, 211 P.3d at 775. With all due respect, this is plainly wrong. Respectfully, the dissent confuses the jurisdictional doctrine of ripeness with the requirements placed on litigants in Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b), which mandates that appellants raise points of error, standards of review, and arguments in individual sections of their briefs. Thus, an issue is not "unripe" if not raised, although failure to raise an error violates HRAP Rule 28(b).

Moreover, contrary to the dissent's position, whether ripeness was raised by the parties is irrelevant here because "[i]t is well-established . . . that lack of subject matter jurisdiction *can never be waived* by any party at any time." *Chun v. Employees' Ret. Sys. of State of Hawaii*, 73 Haw. 9, 13, 828 P.2d 260, 263 (1992) (emphasis added). As this court has stated, "[w]hen reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction." *Amantiad v. Odum*, 90 Hawai'i 152, 159, 977 P.2d 160, 167 (1999). This is because *we have no option* pursuant to HRAP Rule 28(b) to disregard the failure of any party to raise a lack of jurisdiction. *See Chun*, 73 Haw. at 13, 828 P.2d at 263 (stating that it is "absolute[ly] necess[ary] that a court possess subject matter jurisdiction"). Consequently, "[i]f the parties do not raise the issue, 'a court *sua sponte* will, for unless jurisdiction of the court over the subject matter exists, any judgment rendered is in-

valid.'" *Id.* (quoting *In re Application of Rice*, 68 Haw. 334, 335, 713 P.2d 426, 427 (1986)). Because the issue is not ripe, as the ICA itself admitted and the dissent apparently concedes, the ICA lacked jurisdiction to decide the issue, making HRAP Rule 28 simply irrelevant. *See id.*

## III.

Initially, it should be observed that the dissent uses the term "advisory opinion" but does not define it. In a sense, every opinion is "advisory," because to "advise" is "to give an opinion." *Webster's Third New Int'l Dictionary* 32 (1961). Thus, as used by the dissent, the term "advisory opinion" is inexact, and is devoid of any specific legal reference to a legal doctrine, such as ripeness or mootness. Therefore, the cases cited by the dissent lack any coherent connection to the dissent's claim that this court has "issued advisory opinions in the past[,]" dissent at 52, 211 P.3d at 769, and that its decision in this case "brings into question the enforceability of some of our past judgments," *id.* at 54, 211 P.3d at 771. Furthermore, it is apparent that none of the issues decided in the cases cited by the dissent depended on a new test that might never be applied on remand, as is the case here. Hence, the dissent incorrectly relies on these cases in arguing that "the majority's opinion brings into question the enforceability of some of our past judgments[.]" *Id.*

## IV.

In *State v. Nichols*, 111 Hawai'i 327, 329, 141 P.3d 974, 976 (2006), the defendant, who was convicted of terroristic threatening by a jury, alleged on appeal several errors related to the jury instructions. We vacated the judgment and remanded the case for a new trial because the circuit court had erred in failing to give an instruction regarding the "relevant attributes" of the plaintiff and the defendant. In doing so, we also addressed the defendant's other allegations of erroneous jury instructions.[4] *Id.* at 340, 141 P.3d at 987.

---

4. The defendant also alleged that the circuit court had erred in not giving a "lesser included

offense instruction[] and [a] nexus instruction (*i.e.*, instruction that the jury must find that the

In *Nichols*, it was certain that the circuit court would be providing the jury with instructions on remand. Therefore, it was vital for this court to address other allegedly erroneous jury instructions because they posed issues that the circuit court would have to face on remand. In this case, on the other hand, the ICA's test will only be relevant if the LIRAB reduces Respondent's award on remand. However, because the outcome of the LIRAB's decision on remand is uncertain, the ICA could not determine whether its test would be applicable to the LIRAB's decision.

Two other cases cited by the dissent involved jury instructions on remand, and are distinguishable from this case for the same reason as *Nichols*. In *Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 256, 141 P.3d 427, 429 (2006), the circuit court granted summary judgment in favor of the defendant in a negligence case involving a horse-related injury. In its grant of summary judgment, the circuit court had applied HRS chapter 663B, which sets forth a "statutory presumption of non-negligence for [horse]-related injuries." *Id.* at 264, 141 P.3d at 437. This court determined that a genuine issue of material fact existed as to whether a liability waiver signed by the plaintiffs was valid, and remanded the case for trial on that issue. *Id.* at 261, 141 P.3d at 434. It was also ruled that HRS chapter 663B was inapplicable to the plaintiffs' case. *Id.* at 264, 141 P.3d at 437.

In *Courbat*, it was possible that the jury could have found the liability waiver to be valid, meaning that the plaintiffs' negligence claim would fail, and that the applicability of HRS chapter 663B would not matter. However, because the case was remanded for trial, as in *Nichols*, it was necessary for this court to address the applicability of HRS chapter 663B inasmuch as that was an issue

that the circuit court would have to face when giving jury instructions.

In *State v. Mahoe*, 89 Hawai'i 284, 287, 972 P.2d 287, 290 (1998), the defendant was convicted of burglary, an offense requiring the prosecution to prove, among other things, that the defendant possessed an intent to commit "a crime against a person." During the prosecution's closing argument at trial, it argued that the defendant had "inten[ded] to commit a crime against a person either [by] assault or harassment[.]" *Id.* at 286, 972 P.2d at 289. The trial court instructed the jury on the offense of harassment, over the defendant's objection that the "offense of harassment [was] not an offense against a person[.]"[5] *Id.* at 287, 972 P.2d at 290. The defendant raised multiple arguments on appeal, among them that the trial court had erred by giving the harassment instruction. *Id.* at 285, 972 P.2d at 288.

This court did not agree with the defendant's alleged errors,[6] but remanded the case for a new trial "based on [its] independent review of the record" because the defendant's "constitutional rights to due process and unanimous jury verdict were violated." *Id.* (footnotes omitted). *Mahoe* also held that the trial court did not err in giving the harassment instruction because harassment did in fact constitute "a crime against a person." *Id.* at 291, 972 P.2d at 294.

Similar to *Nichols* and *Courbat*, it was obligatory for this court to address the defendant's allegation that the trial court's jury instruction was erroneous, because on remand the trial court would again be providing jury instructions. In order to ensure that the trial court provided proper jury instructions, it was required that this court decide whether the trial court could instruct the jury on the offense of harassment, which depended upon whether harassment was a

threat by [the defendant] was related to, or the result of, the performance of [the plaintiff's] official duties [as a police officer]"). 111 Hawai'i at 338, 141 P.3d at 985.

5. The trial court also instructed the jury on the offense of assault. 89 Hawai'i at 287, 972 P.2d at 290.

6. In addition to his harassment argument, the defendant also argued that the circuit court "erred by: (1) refusing to excuse a juror for cause who stated in voir dire that he had been burglarized previously but would try to be impartial; [and] (2) allowing evidence of a temporary restraining order to be admitted to show the unlawfulness of [the defendant's] entry[.]" *Id.* at 285, 972 P.2d at 288.

crime against a person for purposes of proving burglary.

## V.

Several other cases cited by the dissent involve a fundamental distinction between those cases and the case at bar. In this case, on remand, the LIRAB has to first reach a decision as to Respondent's PPD award. Only *after* the LIRAB determines the amount of Respondent's PPD award will the issue of whether Respondent is entitled to attorney's fees even come up for decision, and only if it returns an award less than that of the Director's would the ICA's test become relevant. In the following cases that are cited by the dissent, however, the issues reached on appeal were immediately applicable to the disposition of the case on remand and applied independently of any decisions made by the trier of fact at the subsequent trial.

In *State v. Wakisaka*, 102 Hawai'i 504, 518, 78 P.3d 317, 331 (2003), the defendant sought a new trial on the basis of, among other things, prosecutorial misconduct, ineffective assistance of counsel, and the circuit court's "exclusion of much of [an expert witness's] proffered testimony" in regard to the victim's anxiety disorder. This court agreed that there had been prosecutorial misconduct and ineffective assistance of counsel, and remanded the case for a new trial on that basis. *Id.* at 507, 78 P.3d at 320. It was also concluded that the circuit court erred in excluding "much of" the expert witness's testimony. *Id.* at 518, 78 P.3d at 331.

In addressing the exclusion of the expert witness's testimony, this court did not create a new test that might never be applied on remand, as the ICA did in this case. Instead, *Wakisaka* decided an issue that the circuit court would have to face on remand, namely, the extent to which the expert witness could testify on an issue raised at trial. Thus, *Wakisaka* is distinguishable from the case at bar.

In *State v. Culkin*, 97 Hawai'i 206, 211, 35 P.3d 233, 238 (2001), the defendant alleged that the circuit court had erred by providing prejudicial jury instructions. The defendant also alleged other errors, including errors regarding the circuit court's allowance of certain impeachment testimony and its exclusion of evidence related to his claim of self-defense. *Id.* This court held that the circuit court's jury instructions were prejudicial, and that the defendant was entitled to a new trial for that reason. *Id.* at 219, 35 P.3d at 246.

*Culkin* also addressed the defendant's other alleged errors, finding, for example, that the circuit court had not abused its discretion in allowing certain impeachment testimony and that it had erred in excluding some of the evidence proffered by the defendant in support of the defendant's self-defense claim. *Id.* at 223–24, 35 P.3d at 250–51. As in *Wakisaka*, it was unavoidable that this court discuss the other errors alleged by the defendant on appeal because the circuit court would have to face those issues on remand.

In *State v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997), the defendant, convicted by a jury of murder and burglary, claimed that the circuit court erred by (1) refusing to dismiss a juror for cause, (2) denying his motion to suppress certain statements he made, and (3) limiting his cross-examination of one of the prosecution's witnesses. This court held that the circuit court erred in not dismissing the juror for cause, and remanded the case for a new trial. *Id.* *Kauhi* went on to "address the remaining issues on appeal, inasmuch as they [would] *undoubtedly resurface on remand.*" *Id.* at 200, 948 P.2d at 1041 (emphasis added). It was held that the circuit court did not err in denying the defendant's motion to suppress or in limiting his cross-examination of a witness. *Id.* at 204, 207, 948 P.2d at 1045, 1048.

Similar to the cases noted above, in *Kauhi* this court recognized that its disposition of the other issues raised by the defendant on appeal would be applicable to the trial of the case on remand. In this case, however, the LIRAB would not apply the ICA's test unless there was a reduction in Respondent's PPD award.

In *State v. Corella*, 79 Hawai'i 255, 258, 900 P.2d 1322, 1325 (App.1995), the defendant alleged that the circuit court had erred by (1) "limiting cross-examination about the complaining witness's [ ] relationship with her

boyfriend[,]" and (2) admitting into evidence an application (the application) filled out by the complaining witness for compensation as a victim of a violent crime. The defendant also contended that the complaining witness had given prejudicial testimony as to the defendant's character. *Id.* The ICA held that the circuit court's limitation on testimony was not harmless, and remanded the case for a new trial. *Id.* at 261, 900 P.2d at 1328. It also stated that "[b]ecause the case [would] be remanded, [it would] address the other two assignments of error." *Id.*

As with the other cases discussed above, it was incumbent upon the ICA to address the defendant's remaining points of error on appeal because the resolution of those issues was certain to be relevant on remand. Whether the application could be admitted into evidence, and what the complaining witness could say in regard to the defendant's character were both issues that the circuit court would have to address in a new trial. In this case, however, it is entirely uncertain whether the ICA's test regarding attorney's fees will apply at all. All of the foregoing cases involved multiple trial errors in the context of a case that was being remanded for a new trial. In all of the cases, each of the issues was *ripe* for decision in and of itself on the facts as they were presented to the appellate court. None of the cases involved a situation where a decisive issue that must be decided on remand was preliminary to a separate issue in the case.

## VI.

The dissent also cites to the following cases where appellate courts have offered "guidance" to the trial court on remand, maintaining that such "guidance" amounted to "advisory opinions." Dissent at 53–54, 211 P.3d at 769–70. The dissent makes too much of the term "guidance." "Guidance" is defined as "the superintendence or assistance rendered by a guide." *Webster's Third New Int'l Dictionary* at 1009. As the court of last resort, one of our roles is to provide "guidance" for the proper administration of justice. The question in each case is not whether an appellate court has offered "guidance," which it does in many forms, but whether the

appellate court thereby addresses matters that must be decided for the appropriate disposition of the issues remanded.

In *E & J Lounge Operating Co., Inc. v. Liquor Commission of City & County of Honolulu,* 118 Hawai'i 320, 322, 189 P.3d 432, 434 (2008), the Liquor Commission (the Commission), after a series of hearings on the applicant's application for a liquor license, denied the application. The central issue in *E & J Lounge* was whether the hearings held by the Commission constituted "contested case hearings" under HRS § 91–11 (1993) such that the Commission was required to follow the requirements of that statute. *Id.* Related to this issue were two other questions: first, whether HRS § 91–11, which required "[Commission] officials [to] personally consider the record before voting on an issue[,]" conflicted with another statute, HRS § 281–59, which required the Commission to deny the application if a majority of neighbors voted against it, *id.* at 338, 189 P.3d at 450; and second, whether the application needed to be "deemed automatically granted for the alleged failure of the Commission to comply with HRS § 91–13.5(c)," which required the Commission to act on the application within a certain time period, *id.* at 347, 189 P.3d at 459.

We determined that HRS § 91–11 did apply to the Commission's hearings, and remanded the case for another hearing before the Commission because it had not complied with HRS § 91–11. *Id.* at 322–23, 189 P.3d at 434–35. This court also decided the related questions in *E & J Lounge* "[f]or purposes of guiding the Commission on remand," holding that there was no conflict between HRS § 91–11 and HRS § 281–59, and that the Commission had complied with HRS § 91–13.5. *Id.* at 350, 189 P.3d at 462. Obviously, discussions of those issues were rudimentary, because the issues were directly related to the outcome of the Commission's decision on remand. First, because the Commission had to hold hearings in compliance with HRS § 91–11, any potential conflict between that statute and HRS § 281–59 would have to be resolved by this court before the Commission could conduct such hearings. Second, had

the Commission failed to comply with HRS § 91–13.5, it would be legally compelled to grant the application on remand. Thus, this court's answers to the related questions were basic to the remand of the case.

In *Gap v. Puna Geothermal Venture*, 106 Hawai'i 325, 340–41, 104 P.3d 912, 927–28 (2004), this court held that the trial court had properly found an attorney's conduct sanctionable under Hawai'i Rules of Civil Procedure Rule 11, but that it had abused its discretion in calculating the amount of the sanction imposed. In remanding the case for a redetermination of the sanction amount, this court "offer[ed] some guidance to the [trial] court" in regard to calculating sanction amounts, because that calculation was to be implemented by the trial court on remand. *Id.* at 341, 104 P.3d at 928. Thus, the discussion of the calculation in *Gap* was needed because it was obvious that the sanction *would* be applied on remand and the trial court had to know how to properly calculate it.

Likewise, in *KNG Corp. v. Kim*, 107 Hawai'i 73, 75, 110 P.3d 397, 399 (2005), the plaintiff filed a complaint against the defendant seeking payment of lease rent for certain property, and, on the return date of the summons on the complaint, "orally moved for the establishment of a rent trust fund pursuant to HRS § 666–21 (1993)." The circuit court granted the motion over the defendant's objection that possession of the property had never been provided. On appeal, the defendant argued that the circuit court could not establish a rent trust fund without a hearing, and further argued that HRS § 666–21 was unconstitutional "on its face and as applied." *Id.* at 76, 80, 110 P.3d at 400, 404.

We vacated and remanded the circuit court's ruling, concluding that because the defendant had claimed that possession of the property was never provided, the circuit court was required to hold a hearing on that issue prior to establishing a rent trust fund. *Id.* at 79–80, 110 P.3d at 403–04. In order "[t]o provide guidance to the [circuit] court on remand," this court ruled on the defendant's constitutional claims, holding that HRS § 666–21 did not violate the constitution's guarantee of rights to due process and equal protection. *Id.* at 80, 110 P.3d at 404.

Because we had *ordered* the circuit court to hold a hearing on remand to determine whether it could take action pursuant to HRS § 666–21, it was necessary for us to decide whether that statute was unconstitutional on its face. The circuit court could not hold a hearing to take action under a statute if the statute was unconstitutional. Therefore, unlike the situation faced by the ICA in the instant case, in *KNG Corporation*, the constitutional question this court discussed on appeal would have arisen before the circuit court on remand.

Similarly, in *Moran v. Guerreiro*, 97 Hawai'i 354, 356, 37 P.3d 603, 605 (App.2001), the plaintiff appealed the dismissal of his suit brought in part "to enforce a contract for the sale of real property[.]" One of the questions in the underlying suit was whether a deed, known as the Sharpe deed, signed by one of the owners of the property, was valid. *Id.* at 374, 37 P.3d at 623. On appeal, the ICA vacated the dismissal of the plaintiff's suit on the basis that he had been prejudiced by *ex parte* communications and remanded the case to the circuit court. *Id.*

The ICA also addressed, "for the circuit court's guidance," the validity of the Sharpe deed, "a legal issue that [had] generated considerable confusion during the proceedings below[.]" *Id.* It set forth a test to be applied, but did not decide the issue because "[m]ore facts ... [were] required to determine the validity of [the Sharpe deed]." *Id.* at 375, 37 P.3d at 624. Like the cases discussed above, it was appropriate for the ICA to do so because it was certain that the validity of the Sharpe deed was an issue that would have to be decided by the circuit court on remand. In the instant case, however, the ICA could not be certain that its test as to attorney's fees would ever be applied.

In *Topliss v. Planning Commission*, 9 Haw.App. 377, 381, 842 P.2d 648, 652 (1993), a developer appealed the Planning Commission's denial of his application for a permit to develop buildings on his property, which was located within a Special Management Area and subject to the requirements of the Coast-

al Zone Management Act (CZMA). The ICA vacated the Planning Commission's decision and remanded the case, concluding that in denying the permit, the Planning Commission had failed to comply with the CZMA because it had not made a finding of fact regarding whether the development would impact the coastal zone before it denied the permit. *Id.* at 394, 842 P.2d at 658. *Topliss* also discussed the CZMA's requirement that the Planning Commission was required to determine whether any impact of the development could be mitigated if on remand it was found that the development would cause an impact on the coastal zone. *Id.* It was essential for the ICA to do so because the developer had indicated to the Planning Commission that he would be willing to minimize the impact of the project, but "[i]t d[id] not appear from the record that the [Planning] Commission considered [the developer's] offer as . . . it was required to do under the statute." *Id.*

In this case, however, the ICA's discussion of attorney's fees was not based on any error that it perceived the LIRAB had committed in refusing to grant Respondent's request for attorney's fees. Indeed, it could not be, because the LIRAB's PPD award had been vacated, and no decision on attorney's fees existed for the ICA to address. Instead, the ICA created a new test based on its interpretation of a statute, absent any evidence that such a test would be relevant to the LIRAB's decision on attorney's fees on remand.

Similarly, in *State v. Hoang,* 94 Hawai'i 271, 272–73, 12 P.3d 371, 372–73 (App.2000), the defendant argued on appeal that the trial court had failed to obtain a waiver of his right to testify, and that it did not afford him his right to allocution at sentencing because the court had addressed the defendant's counsel rather than the defendant. The ICA agreed that the defendant's right to testify had been violated, and "remand[ed] for a new trial." *Id.* at 281, 12 P.3d at 381.

The ICA addressed the defendant's allocution argument, holding that to satisfy a defendant's right to allocution, the trial court could not address the defendant through his counsel, but needed to "solicit allocution directly from the defendant at sentencing."

*Id.* In so holding, the ICA noted that in *State v. Chow,* 77 Hawai'i 241, 247, 883 P.2d 663, 669 (App.1994), it had previously held that the trial court was " 'affirmatively require[d]' " to " 'make direct inquiry of the defendant's wish to address the court before sentence is imposed.' " *Hoang,* 94 Hawai'i at 281, 12 P.3d at 381. Thus, the ICA merely reiterated precedent that had already been set forth in *Chow,* rather than crafting a new test of uncertain applicability, as the ICA has done in this case. Furthermore, as in *Topliss,* the ICA was addressing a specific error that the trial court had committed. In this case, on the other hand, the ICA's test regarding attorney's fees had yet to be tied to any specific action on the part of the LIRAB, because the remand of the case to determine Respondent's PPD award meant that there was no longer a decision on an award of attorney's fees.

In *In re Water Use Permit Applications,* 105 Hawai'i 1, 5, 93 P.3d 643, 647 (2004), after several plaintiffs filed petitions to restore water that was being diverted from streams to a water diversion system, the Water Commission issued an order establishing Interim Instream Flow Standards (IIFS) that set the amount of water that could be diverted. In setting the IIFS, the Water Commission had concluded that stream levels at the time of the case were greater than stream levels in the 1960s. *Id.* at 12, 93 P.3d at 654. The Water Commission based this conclusion on testimony (the 1960s testimony) that the water level in the 1960s "was adequate to support the stream's ecosystem." *Id.*

On appeal, the plaintiffs argued that the Water Commission erred by relying on the 1960s testimony. *Id.* at 11–12, 93 P.3d at 653–54. This court vacated the Water Commission's IIFS, holding that the Water Commission's conclusion regarding relative water levels was unsupported by any finding because the Water Commission had not made a finding as to the actual amount of water in the streams in 1960, and remanded the case so that the Water Commission could make such a finding. *Id.* at 12, 93 P.3d at 654. In doing so, this court noted that if the Water Commission could support its conclusion with

findings on remand, it could utilize the 1960s testimony to establish IIFS. *Id.* Because the Water Commission's IIFS was being vacated and remanded, it was necessary that this court decide what facts on remand the Water Commission could use to establish an IIFS. In this case, however, the ICA's test was unnecessary because it is not evident that the situation to which it is applicable will arise at all.

Finally, in *Ditto v. McCurdy*, 102 Hawai'i 518, 520, 78 P.3d 331, 333 (2003), the plaintiff had obtained a jury award of over $1 million against the defendant in 1992. Following appeals and delays caused by the defendant's bankruptcy, the circuit court issued a writ of execution on November 22, 1999, allowing the sheriff to levy the defendant's property. *Id.* On February 8, 2000, the sheriff levied the execution. *Id.* at 521, 78 P.3d at 334. The defendant appealed, arguing that the "levy was invalid insofar as it was made after the expiration of the return day of the execution" and that the writ of execution was "void for failing to specify whose property was to be levied upon." *Id.* at 520, 78 P.3d at 333.

*Ditto* held that under HRS § 651–34, which requires writs of execution to be returnable within sixty days of their issuance, the writ of execution in that case was "returnable prior to January 21, 2000[,]" and therefore the sheriff's levy was invalid. *Id.* at 522, 78 P.3d at 335. This court also addressed the defendant's argument that the writ of execution itself was void for lack of specificity. *Id.* at 523, 78 P.3d at 336. It was held that the writ of execution issued by the circuit court, which "command[ed] the authorized officer to levy upon 'any and all personal property found at [the defendant's address,]'" but failed to identify the defendant by name, was "overly broad." *Id.* at 524–25, 78 P.3d at 337–38.

In *Ditto*, the plaintiff's levy of the defendant's property was reversed on a procedural error, and thus this court could be certain that the plaintiff would seek a new or alias

writ of execution, as authorized by HRS § 651–38.[7] Because the circuit court would again be issuing a writ of execution, it was necessary to address the error of failing to specify the name of the person being levied. By contrast, in this case, the ICA's attorney's fees test will only be relevant if the LIRAB returns an award lower than that of the Director's, an outcome which is entirely uncertain on remand.

VII.

As the foregoing discussion of the cases cited by the dissent indicates, this court and the ICA addressed issues that were directly applicable to an existing underlying dispute on remand. For that reason, the issues presented "actual controversies" that were ripe for decision. *Wong*, 62 Haw. at 394, 616 P.2d at 204. Because the ICA's test regarding attorney's fees was unripe, I concur that that portion of the ICA opinion should be vacated.

Dissenting Opinion by NAKAYAMA, J.

I respectfully dissent. The majority holds that the ICA gravely erred because its opinion "regarding the issue of attorney's fees and costs was not ripe for decision and constitutes an advisory opinion akin to the issuance of an opinion where there is no subject matter jurisdiction." Majority opinion at 43–44, 211 P.3d at 760–61. However, with all due respect, the majority overlooks that this court has also issued advisory opinions in the past. *See, e.g., E & J Lounge Operating Co., Inc. v. Liquor Comm'n of City & County of Honolulu*, 118 Hawai'i 320, 350, 189 P.3d 432, 462 (2008) (providing guidance to the Liquor Commission of the City & County of Honolulu on remand with regard to the proper interpretation of Hawai'i Revised Statutes (HRS) §§ 91–11, 281–59(a), and 91–13.5); *State v. Nichols*, 111 Hawai'i 327, 340, 141 P.3d 974, 987 (2006) ("Because we vacate the judgment below and remand for a new trial due to the plain error discussed in Section III.A, we need not consider Nichols' remain-

7. HRS § 651–38 states that "[a]ny circuit court, out of which an execution has been issued, if such execution has been returned unsatisfied wholly or in part, may issue an alias execution to the same circuit, or an execution leviable in some other circuit[.]" An "alias execution" is "[a] second execution issued to enforce a judgment not fully satisfied by the original writ." *Black's Law Dictionary* 609 (8th ed.2004).

ing points of error. We nevertheless address them in order to provide guidance to the circuit court on remand."); *Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 263–64, 141 P.3d 427, 436–37 (2006) (holding that the circuit court erred in granting summary judgment, but providing guidance on remand to the trier of fact that, among other things, "it was error for the circuit court in the present matter to apply" a certain statute); *KNG Corp. v. Kim*, 107 Hawai'i 73, 80, 110 P.3d 397, 404 (2005) ("provid[ing] guidance to the court on remand," this court "address[ed] Defendant's argument" regarding the constitutionality of a statute); *Gap v. Puna Geothermal Venture*, 106 Hawai'i 325, 341–43, 104 P.3d 912, 928–30 (2004) (offering guidance to the circuit court on remand with regard to setting the appropriate sanction); *In re Water Use Permit Applications*, 105 Hawai'i 1, 12, 93 P.3d 643, 654 (2004) (remanding the proceedings to the Commission on Water Resource Management for further findings and opining that, "[i]f, on remand, the Water Commission is able to support its conclusion with findings quantifying the windward streams' flows during the 1960s, then the 1960s testimonials would be sufficient to set the [interim instream flow standard] at the levels established in the [Water Commission's decision & order]" for several reasons); *Ditto v. McCurdy*, 102 Hawai'i 518, 523, 78 P.3d 331, 336 (2003) (providing guidance to the circuit court and parties regarding writs of execution); *State v. Wakisaka*, 102 Hawai'i 504, 518, 78 P.3d 317, 331 (2003) ("Although the previous two issues are dispositive of this case, we address the court's exclusion of much of Dr. Lawler's proffered testimony in order to provide some guidance on retrial."); *State v. Culkin*, 97 Hawai'i 206, 211, 35 P.3d 233, 238 (2001) (providing guidance to the circuit court on remand regarding certain evidentiary rulings); *State v. Mahoe*, 89 Hawai'i 284, 285, 972 P.2d 287, 288 (1998) (holding that Mahoe's constitutional rights were violated, but electing to "address Mahoe's third point of error" regarding a jury instruction "because it raises a novel issue that has the potential to recur in future cases"); *State v. Kauhi*, 86 Hawai'i 195, 200, 948 P.2d 1036, 1041 (1997) (vacating Kauhi's convictions and remanding to the circuit court for a new trial, but "address[ing] the remaining issues on appeal," which involved evidentiary and constitutional issues, "inasmuch as they will undoubtedly resurface on remand"). By holding that the Intermediate Court of Appeals ("ICA") gravely erred because a portion of its opinion was advisory, the majority's holding appears to implicate the precedential significance of certain past decisions of this court.

Moreover, the ICA has, in the past, likewise issued opinions similar to the advisory opinions issued by this court. *See, e.g., Moran v. Guerreiro*, 97 Hawai'i 354, 374, 37 P.3d 603, 623 (App.2001) ("Because of our vacatur of the order dismissing Moran's complaint with prejudice, we address, for the circuit court's guidance on remand, a legal issue that generated considerable confusion during the proceedings below—the validity of the May 7, 1992 deed which Sharpe signed, conveying her 1/18 interest in Parcel 3 to Moran."); *State v. Hoang*, 94 Hawai'i 271, 281, 12 P.3d 371, 381 (App.) (providing guidance on remand regarding the defendant's right to allocution), *cert. denied*, 94 Hawai'i 329, 13 P.3d 854 (2000); *State v. Corella*, 79 Hawai'i 255, 261, 900 P.2d 1322, 1328 (App.1995) (providing guidance on remand regarding certain evidentiary issues); *Topliss v. Planning Comm'n*, 9 Haw.App. 377, 394, 842 P.2d 648, 658 (1993) (providing guidance to the Planning Commission of the County of Hawai'i on remand regarding its options upon reconsideration of the plaintiff's petition for a special management area permit). In this regard, the majority does not explain why we may issue advisory opinions and the ICA, pursuant to the majority's holding, cannot.

Indeed, the majority concludes that, because the attorney's fees and costs issue is unripe, there is a lack of subject matter jurisdiction for the ICA to consider this issue at this time. Majority opinion at 43–44, 211 P.3d at 760–61. However, if, according to the majority, the ICA lacked jurisdiction because the attorney's fees and costs issue is unripe, then it logically follows that we too lacked jurisdiction to issue the advisory opinions that we did. *See State v. Moniz*, 69 Haw. 370, 373, 742 P.2d 373, 376 (1987) ("[A]ppellate courts are under an obligation

to insure that they have jurisdiction to hear and determine each case."). Therefore, the majority's opinion brings into question the enforceability of some of our past judgments, some of which are cited above. *See id.*

Nonetheless, the majority contends that the ICA, by "provid[ing] guidance to the [Labor and Industrial Relations Appeals Board ("LIRAB")], . . . raises serious concerns regarding separation of powers, judicial interference, and premature adjudication." Majority opinion at 41, 211 P.3d at 758. However, with all due respect, the majority overlooks that the plain language of HRS § 386–93(b) applies not only to attorney's fees and costs incurred in connection with proceedings before the LIRAB, but also to those fees and costs incurred in proceedings before "the supreme court of the State[.]" In this regard, similar to the reasoning expressed by the ICA in this case, *see Kapuwai v. City & County of Honolulu*, 119 Hawai'i 304, 313, 196 P.3d 306, 315 (App. 2008), any determination of whether an "employer" is the "lose[r]" on appeal to "the supreme court of the State" must be based on the final decision of the "supreme court." *See Lindinha v. Hilo Coast Processing Co.*, 104 Hawai'i 164, 171–72, 86 P.3d 973, 980–81 (2004) ("[T]he plain language of [HRS § 386–93(b)] . . . does not qualify that stage in the appellate process at which the employer must lose in order to incur liability for attorney's fees and costs. . . . Thus the text [of HRS § 386–93(b)] contemplates an appeal that is ultimately decided in this court." (Brackets and ellipses added.)). Furthermore, this court has said that HRS § 386–93(b)

> plainly authorizes assessment of attorney's fees and costs against the employer if it loses, whether the case ends in the LIRAB or this ourt.[] The gravamen of the statute is that attorney's fees and costs are awarded to the employee if the employer ultimately loses its appeal, *irrespective of where the appeal was first brought.* As such, we read the statute as assessing fees

and costs against an employer if the employer *loses the final appeal.*

*Id.* (emphases added) (footnote omitted).[1] By its plain language, then, an assessment of whether "the employer loses the final appeal" applies to those appeals not only before the LIRAB, but also before an appellate court. *See id.*

In that connection, in my view it is difficult to discern how the ICA has, as stated by the majority, "implicat[ed] separation-of-powers concerns," majority opinion at 43, 211 P.3d at 760, when the plain language of HRS § 386–93(b) applies to the judicial branch of the government in the same manner as the executive branch. Indeed, the cases that the majority relies on illustrate well the distinction between the attorney's fees and costs issue in this case and those areas committed to other branches of the government.

For example, in *Save Sunset Beach Coalition v. City & County of Honolulu*, 102 Hawai'i 465, 482, 78 P.3d 1, 18 (2003), the plaintiffs asserted, *inter alia,* that a permitted use of land under the City's county district exceeded the state agricultural district because it allowed for the use of a "dwelling, detached, one-family," and required no special permit for such use. This court ultimately affirmed the circuit court's grant of summary judgment on ripeness grounds because the owner of the land in question claimed that it would comply with HRS chapter 205, and the City represented that it would enforce the appropriate statutes and zoning ordinances and allow only the most restrictive use of the land in the event of a conflict. *Id.; see id.* at 481, 78 P.3d at 17 ("[A]ny conflict between the State provisions and the county zoning ordinances is resolved in favor of the State statutes, by virtue of the supremacy provisions in article VIII, section 6 of the Hawai'i Constitution[] and HRS § 50–15.[]" (Footnotes omitted and brackets added.)).

Significantly, however, this court expressly "conclude[d] that a zoning ordinance is a legislative act and is subject to the deference given legislative acts" because such an ordinance "predetermine[s] what the law shall be

---

1. In a footnote, this court noted that, "[o]f course, an appeal to the supreme court may be assigned to the ICA." *Lindinha,* 104 Hawai'i at 171 n. 12, 86 P.3d at 980 n. 12 (brackets added).

for the regulation of future cases falling under its provisions[,] ... rather than merely 'execut[ing] or administer[ing] a law already in existence[.]'" *Id.* at 474, 78 P.3d at 10 (quoting *Life of the Land, Inc. v. City Council,* 61 Haw. 390, 423–24, 606 P.2d 866, 887 (1980)) (brackets added and in original, ellipsis added, some internal quotation marks omitted); *see id.* at 480, 78 P.3d 1, 78 P.3d at 16 ("The counties of our state derive their zoning powers from HRS § 46–4(a) (Supp. 1998), referred to as the Zoning Enabling Act." (Internal quotation marks and citation omitted.)). Accordingly, we observed that "[p]rudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society, considerations flowing from our coequal and coexistent system of government, dictate that we *accord those charged with drafting and administering our laws a reasonable opportunity to craft and enforce them* in a manner that produces a lawful result." *Id.* at 483, 78 P.3d at 19 (emphasis added) (brackets in original) (internal quotation marks and citation omitted).

The ripeness issue in *Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 28 P.3d 350 (App.2001) is very similar to that of *Save Sunset Beach Coalition.* Therein, the ICA declined to address the plaintiff's challenge to a zoning ordinance because, according to the ICA, "until there is actual implementation of the zoning ordinance in the form of a specific development project proposed or approved under the ordinance," the plaintiff's assertions were not ripe for adjudication. *Id.* at 143–44, 28 P.3d at 359–60. The ICA's holding was based on its "concern about infringing upon the authority of our elected brethren[,]" which "becomes particularly acute whenever a challenge to legislation predates efforts to implement its provisions." *Id.* In other words, in light of *Save Sunset Beach Coalition,* the ICA essentially held that the zoning ordinance in question "predetermine[d] what the law shall be for the regulation of future cases falling under its provisions[,]" and, as a result, the plaintiff's assertions were not ripe for adjudication until actual implementation thereof. *See* 102 Hawai'i at 474, 78 P.3d at 10 (brackets added

and in original) (internal quotation marks and citation omitted).

In *State v. Fields,* the circuit court attached certain conditions to the defendant's probation, one of which, the defendant asserted, infringed on her constitutional right to be free from unreasonable searches and seizures. 67 Haw. 268, 273, 686 P.2d 1379, 1385 (1984). The defendant's request for judicial review of the condition came "before any effort of the government to exploit the particular condition of probation." *Id.* Accordingly, the prosecution asserted that "the self-imposed rules governing the exercise of [this court's] statutory jurisdiction militate against a present review of the circuit court's order." *Id.* However, notwithstanding the prosecution's ripeness argument, this court addressed the defendant's assertion by focusing on the "propriety" of the condition itself, rather than the "discretion vested in the sentencing court" by the legislature "to saddle a probationer with any condition 'reasonably related to [his] rehabilitation ... and not unduly restrictive of his liberty or incompatible with his freedom or conscience.'" *See id.* at 276–77, 686 P.2d at 1386–87 (citation omitted) (brackets and ellipsis in original).

Significantly, this court's discussion of the ripeness issue in *Fields* did not involve any other branch of the government except the legislature. *See id.* As such, this court's ripeness discussion in *State v. Maugaotega,* 115 Hawai'i 432, 168 P.3d 562 (2007) ("*Maugaotega II*") contrasts well with *Fields.*

In *Maugaotega II,* this court "declined to assert its inherent authority to empanel a jury on remand because, as a rule, prudential rules of judicial self-governance properly limit the role of the courts in a democratic society[,]" and "[o]ne such rule is that, 'even in the absence of constitutional restrictions, courts must still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government.'" *Id.* at 450, 168 P.3d at 580 (block format, brackets, emphasis, and citations omitted). In other words,

in Act 230, *the legislature* expressed its intent regarding how best to conform our extended term sentencing regime to the requirements of *Apprendi [v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ] and its progeny and, in so doing, *did not vest* in the jury the power to find the requisite aggravating facts but, rather, directed that the sentencing court should retain that responsibility.

*Id.* at 449, 168 P.3d at 579 (referring to 2006 Haw. Sess. L. Act 230, §§ 23 and 24 at 1012–13) (emphases added). In *Maugaotega II,* the area committed to another branch of government that this court was concerned with encroaching upon was the lawmaking function of the legislature: "[T]he [c]ourt's function in the application and interpretation of ... laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out." *Id.* at 450, 168 P.3d at 580 (quoting *Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 467, 879 P.2d 1037, 1050 (1994) (Klein, J., concurring and dissenting)) (internal quotation marks omitted) (brackets and ellipsis in original). Thus, instead of "intru[ding] into areas committed to" the legislative branch of government, this court decided to exercise "self-restraint" by declining to assert our inherent authority to empanel a jury on remand. *See id.* at 449–51, 168 P.3d at 578–81.

As mentioned above, all three cases that the majority relies on illustrate well the distinction between the attorney's fees and costs issue in this case and those areas committed to other branches of the government. More specifically, unlike *Save Sunset Beach Coalition* and *Bremner,* the LIRAB in this case would be "merely 'execut[ing] or administer[ing] a law already in existence[ ]' "—namely, HRS § 386–93(b)—rather than a "legislative act" of the LIRAB that "predetermine[s] what the law shall be for the regulation of future cases falling under [the legislative act's] provisions." *See Save Sunset Beach Coalition,* 102 Hawai'i at 474, 78 P.3d at 10 (internal quotation marks and citation

omitted, brackets added); *Bremner,* 96 Hawai'i at 143–44, 28 P.3d at 359–60. Moreover, instead of "intru[ding] into areas committed to other branches of government[,]" *see Maugaotega II,* 115 Hawai'i at 450, 168 P.3d at 580 (brackets added, emphasis omitted), the ICA, by providing guidance to the LIRAB, was merely interpreting the language of HRS § 386–93(b). *See id.; see also Fields,* 67 Haw. at 276–81, 686 P.2d at 1386–89 (interpreting the language of the relevant statutory provision in effect at that time that "vested" the sentencing court with "discretion" "to saddle a probationer with any condition 'reasonably related to [his] rehabilitation ... and not unduly restrictive of his liberty or incompatible with his freedom or conscience' ").

Additionally, it is well established that, if possible, statutes will be construed in such a manner so as to avoid conflicting interpretations of the same statute. *See Colony Surf, Ltd. v. Dir. of Dep't of Planning & Permitting,* 116 Hawai'i 510, 516, 174 P.3d 349, 355 (2007) ("[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." (Citation and internal quotation marks omitted.)). Inasmuch as the plain language of HRS § 386–93(b) applies to the executive branch of the government in the same manner as the judicial branch, and the LIRAB in this case would be "merely 'execut[ing] or administer[ing] a law already in existence[,]' " *see Save Sunset Beach Coalition,* 102 Hawai'i at 474, 78 P.3d at 10, the language of the statute should be interpreted consistently amongst the branches.[2] *See Colony Surf,* 116 Hawai'i at 516, 174 P.3d at 355. Therefore, in my view it cannot be said, as the majority contends, that an award of attorney's fees and costs pursuant to HRS § 386–93(b) constitutes a matter that is "reserved for administrative agencies in other branches of the government." Majority opinion at 41, 211 P.3d at 758. Accordingly, inasmuch as I believe that the majority misuses this court's

---

2. In this regard, I believe that my reliance on the afore-cited cases of this court that have provided guidance on remand by interpreting the language of various statutes and rules to be quite relevant

here, notwithstanding the concurring opinion's novel approach at distinguishing each of them from the instant case. *See* Concurring opinion at 44–52, 211 P.3d at 761–69.

separation of powers jurisprudence, the majority's conclusion that the ICA lacked jurisdiction to issue an advisory opinion in this case logically leads to the same conclusion that we too lacked jurisdiction to issue the advisory opinions that we did. *See Moniz,* 69 Haw. at 373, 742 P.2d at 376.

Finally, in light of this court's prior cases that have provided guidance on remand, I believe that the ICA had jurisdiction to consider this statutory interpretation issue. As such, I point out that Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1(d)(1) and (4) (2009) provides:

> The application for a writ of certiorari ... shall contain, in the following order:
>
> (1) A short and concise statement of the questions presented for decision, set forth in the most general terms possible. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein. Questions not presented according to this paragraph will be disregarded. The supreme court, at its option, may notice a plain error not presented.
>
> . . . .
>
> (4) A brief argument with supporting authorities.

In its application for writ of certiorari, the Petition/Employer–Appellee City and County of Honolulu, Department of Parks and Recreation ("the City") asserted, *inter alia,* that the ICA gravely erred "when it concluded an employer is regarded as the loser on appeal if it fails to obtain a substantial reduction of the compensation award." The City based its assertion on the plain language of HRS § 386–93(b) (1993), pertinent case law, and the standard of appellate review applicable to mixed questions of law and fact. As recognized by the majority, *see* majority opinion at 49, 211 P.3d at 766, nowhere within its application does the City assert that the ICA gravely erred because it issued an advisory opinion in its interpretation of HRS § 386–93(b). Additionally, nowhere within its statement in opposition to the City's application for writ of certiorari does Respondent/Claimant–Appellant Darrell N. Kapuwai ("Kapuwai") assert that the attorney's fees and costs issue was ripe for decision by the ICA,

and neither party has presented the separation of powers argument relied upon by the majority.

This court has consistently declined to address an issue either not raised as a point of error or not argued. *See, e.g., Jou v. Dai–Tokyo Royal State Ins. Co.,* 116 Hawai'i 159, 171, 172 P.3d 471, 483 (2007) (deeming certain points of error waived pursuant to HRAP Rule 28(b)(7) because they were not argued, and disregarding certain arguments pursuant to HRAP Rule 28(b)(4) because they were not raised as points of error). Notwithstanding the requirements of HRAP Rule 28(b)(4), this court has, under certain circumstances, "adhered to the policy of affording litigants the opportunity to have their cases heard on the merits, where possible." *Morgan v. Planning Department, County of Kauai,* 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004) (citation and internal quotation marks omitted). However, adherence to the above policy requires that the party actually raise the issue before an appellate court. *See id.* ("Because the issues raised by the Planning Department and Planning Commission are of great importance to this community, we address the merits of the issues raised, notwithstanding a technical violation of [HRAP Rule 28(b)(4)]."). Again, nowhere does the City assert that the ICA gravely erred because the attorney's fees and costs issue was not ripe for decision.

By preempting the adversarial process in its review of the ICA's decision on ripeness grounds, the majority forecloses any argument that could have been brought on this issue by either party in this case. Therefore, and with all due respect, in my view it may also be said that the ripeness issue that the majority addresses is likewise unripe because none of the parties have argued it before this court.

For these reasons, I respectfully dissent.